# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Ellison, 2013 IL App (1st) 101261**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BENNIE ELLISON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-1261 |
| Filed | March 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for unlawful possession of a controlled substance with intent to deliver was reduced to possession of a controlled substance, since the State only presented evidence that defendant was carrying an amount of heroin that was consistent with personal use, he appeared at a drug house seeking to purchase a small amount of drugs and he had a cellular telephone, but in the absence of any evidence about the purity of the drugs, how they were packaged, and any cash or drug paraphernalia, there was no support for a finding that defendant intended to deliver drugs. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-6863; the Hon. Joseph Kazmierski, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Michael H. Orenstein, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Sarah L. Simpson, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE EPSTEIN delivered the judgment of the court, with opinion.
Presiding Justice Lavin and Justice Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Bennie Ellison was charged by indictment with possession of a controlled substance with intent to deliver less than 1 gram of heroin and possession of a controlled substance with intent to deliver 1 or more but less than 15 grams of cocaine. Following a jury trial, defendant was found guilty on both charges and sentenced to 10 years in prison. On appeal, defendant argues that (1) the evidence was insufficient to show that he intended to deliver the drugs; (2) the trial court erred in finding that the officers who arrested defendant had probable cause to believe that defendant committed a crime; (3) the trial court improperly refused to allow defendant to impeach a witness by omission; and (4) the trial court erred in denying standby counsel and did not do enough to ensure defendant had law library access.

¶ 2    Prior to trial, defendant, acting *pro se*, filed a motion to quash arrest and suppress evidence. The motion judge heard testimony from two officers of the Chicago police department. Officer Robert Darko testified that late on March 18, 2009, he was watching for drug activity at a house at 7759 South Euclid Avenue in Chicago. From 30 feet away, using binoculars, he saw Ellison approach the house, exchange an unknown amount of money for a "small object," and leave. Based on his experience, which included hundreds of drug arrests, Officer Darko thought he had seen a drug deal. He radioed a description of defendant to other officers on surveillance.

¶ 3    Officer Vladen Milenkovic testified that he and his partner were waiting in a vehicle in an alley near the surveillance location at 7:20 p.m. The officers were conducting surveillance after receiving information that narcotics were being sold out of 7759 South Euclid, which was in "an area of high narcotics activity." After receiving Officer Darko's call, Officer Milenkovic and his partner drove to the location and saw defendant, who matched Darko's description. Officer Milenkovic and his partner got out of the car, announced their office, and approached defendant. His partner asked defendant if they could talk with defendant, and

-2-

defendant responded, "Let me show you what I got." When defendant made that statement, he pointed with his right hand to his right front pants pocket. His partner then recovered plastic bags of suspect heroin from defendant's pocket and placed defendant under arrest. Officer Milenkovic testified that he and his partner did not surround defendant or prevent him from leaving in any way. If defendant had chosen not to answer their questions, he would have been free to walk away.

¶ 4    At the conclusion of the testimony, the court denied defendant's motion. The court found that Officer Darko observed defendant conduct a narcotics transaction and when the other officers approached defendant to investigate, he "volunteered the drugs." On those facts, the court concluded that the officers had probable cause to arrest defendant.

¶ 5    At trial, Officer Malinowski, the officer working with Officer Milenkovic, testified for the State. Officer Malinowski stated that just shortly after 7 p.m., he received a radio transmission from Officer Darko with a physical and clothing description of a person engaged in a narcotics sale that Officer Darko had just witnessed. Officers Malinowski and Milenkovic drove a short distance and saw defendant.

¶ 6    Officer Malinowski testified that when he told defendant he was a police officer and asked if he could speak with him, defendant "put his hands up" and said "let me show you what I got." Defendant then moved his hand toward his pocket. Malinowski stopped him because he "didn't know what he's going for for safety reasons." Officer Malinowski then performed a pat down search and felt a plastic bag in defendant's pants pocket. He found two small white bags in defendant's pocket with a white powder he suspected to be heroin. Malinowski later searched Ellison at the police station. In defendant's sock, Malinowski found one more bag of white powder suspected to be heroin and a large bag with 17 smaller bags, each with a white, rock-like substance suspected to be cocaine.

¶ 7    Officer Darko testified consistent with his testimony at the hearing on defendant's motion to quash arrest and suppress evidence. Officer Milenkovic also provided testimony consistent with his earlier testimony, though at trial he testified that when defendant pointed to his pants pocket, he said something that Milenkovic could not hear. Milenkovic testified that he then heard Malinowski tell defendant to stop. Both Milenkovic and Malinowski testified about the chain of custody for the recovered narcotics.

¶ 8    The State then presented the testimony of forensic chemist Martin Palomo. Palomo testified that the gross weight of the 17 items recovered from defendant's sock was 3.112 grams. After testing 8 of the 17 items, he found that those 8 items contained cocaine in the amount of 1.1 grams. With regard to the two items initially recovered from defendant's pocket, Palomo testified that they contained 0.3 grams of a substance containing heroin. The one additional item recovered from defendant's sock contained less than 0.1 grams of a substance containing heroin.

¶ 9    After the chemist's testimony, the State rested. The jury convicted defendant on both counts of possession with intent to deliver, and the judge sentenced him to 10 years in prison. Defendant now appeals.

¶ 10                                    ANALYSIS
¶ 11                    Sufficiency of the Evidence as to Intent to Deliver

¶ 12    Defendant first argues that the evidence presented at trial was insufficient to support a conviction for possession with intent to deliver. Considering the evidence in the light most favorable to the State, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). We will not substitute our judgment for that of the trier of fact with regard to the credibility of witnesses, the weight to be given to each witness's testimony, or the reasonable inferences to be drawn from the evidence. *Ross*, 229 Ill. 2d at 272. A defendant's conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to his guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 13    To establish narcotics possession with intent to deliver, the State must prove three elements: that the defendant knew of the narcotics; that the narcotics were in the defendant's immediate possession or control; and that the defendant intended to deliver them. 720 ILCS 570/401 (West 2008); *People v. Robinson*, 167 Ill. 2d 397, 407 (1995). The focus in this case is on the third element: whether there was sufficient evidence to show that defendant intended to deliver the drugs found on his person.

¶ 14    Direct evidence of intent to deliver is rare, and intent is most often proven by circumstantial evidence. *Robinson*, 167 Ill. 2d at 407; *People v. Sherrod*, 394 Ill. App. 3d 863, 865 (2009). Our task is to examine the nature and quantity of circumstantial evidence to determine if it supports an inference of intent to deliver. *Robinson*, 167 Ill. 2d at 408. Factors relevant in this inquiry include: (1) whether the quantity of drugs possessed is too large to be reasonably viewed as being for personal consumption, (2) the degree of drug purity, (3) the possession of any weapons, (4) possession and amount of cash, (5) possession of police scanners, beepers or cellular telephones, (6) possession of drug paraphernalia commonly associated with narcotics transactions, and (7) the manner in which the drug is packaged. *Id.*; *People v. Little*, 322 Ill. App. 3d 607, 615 (2001). The *Robinson* court, however, simply provided examples of the "many different factors that have been considered by Illinois courts as probative of intent to deliver." *Robinson*, 167 Ill. 2d at 408 (collecting cases); *People v. White*, 221 Ill. 2d 1, 17 (2006), *abrogated on other grounds by People v. Luedemann*, 222 Ill. 2d 530 (2006); accord *People v. Blakney*, 375 Ill. App. 3d 554, 558 (2007). This list of "factors" is not "exhaustive" or "inflexible." *People v. Bush*, 214 Ill. 2d 318, 328 (2005) (stating that evidence that defendant was standing alone behind a fence at 2 a.m. selling small items from a brown paper bag that was later found to contain cocaine was as "equally probative of intent to deliver" as the *Robinson* factors).

¶ 15    In cases where the amount of the controlled substance cannot reasonably be viewed as designed for personal consumption, the quantity of the controlled substance alone can be sufficient to prove an intent to deliver beyond a reasonable doubt. *Robinson*, 167 Ill. 2d at 410-11. In this case, there was no testimony that the amount of drugs recovered–3.112 grams of cocaine and approximately 0.4 grams of heroin–was inconsistent with personal use, and the State does not dispute that the quantity of drugs could be consistent with personal use.

Illinois courts have so held in cases where greater amounts of drugs were recovered. See, *e.g.*, *Robinson*, 167 Ill. 2d at 413 (possession of 2.2 grams of PCP and 2.8 grams of cocaine consistent with personal use); *People v. Nixon*, 278 Ill. App. 3d 453, 458 (1996) (stating that 6.6 grams of cocaine was a "relatively small amount" and ultimately finding no intent to deliver); *People v. McLemore*, 203 Ill. App. 3d 1052, 1056 (1990) (3.3 grams of cocaine not greater than would be used for personal consumption).

¶ 16       In cases where the amount seized "may be considered consistent with personal use, our courts have properly required additional evidence of intent to deliver to support a conviction." *Robinson*, 167 Ill. 2d at 411. This court has held that when a defendant possesses narcotics within the range of personal use, "the minimum evidence a reviewing court needs to affirm a conviction is that the drugs were packaged for sale, and at least one additional factor tending to show intent to deliver." *Blakney*, 375 Ill. App. 3d at 559 (citing *People v. Beverly*, 278 Ill. App. 3d 794, 802 (1996)); *People v. Clinton*, 397 Ill. App. 3d 215, 225 (2009). We have emphasized, however, that there is " 'no hard and fast rule to be applied in every case.' " *Sherrod*, 394 Ill. App. 3d at 866 (quoting *Robinson*, 167 Ill. 2d at 414).

¶ 17       Defendant argues that even if the items recovered from him could be considered "packaged for sale," there is no other evidence, whether among the factors listed in *Robinson* or not, that supports an inference of an intent to deliver narcotics. The State counters that an intent to deliver can be inferred because defendant was carrying two different types of drugs but no paraphernalia for personal use, he was found in an area of high narcotics activity, and he was carrying a cellular phone. We consider each of the State's contentions in turn.

¶ 18       The State first argues that because defendant had both heroin and cocaine, but no paraphernalia associated with personal use, an inference can be drawn that the drugs were likely not for personal consumption. The State correctly observes that this court has noted that a combination of drugs may be a relevant consideration when determining whether the evidence shows that defendant had the intent to deliver. See *People v. Green*, 256 Ill. App. 3d 496, 501 (1993) (evidence was sufficient to permit inference of intent to deliver where defendant possessed a total of 44 packets of both cocaine and heroin); but see *People v. Delgado*, 256 Ill. App. 3d 119, 123 (1993) (finding that possession of combination of heroin and cocaine was not probative of intent to deliver because "[d]rug users commonly mix heroin and cocaine into what is called a 'speedball' ").

¶ 19       While we agree that the variety of drugs is a relevant consideration, the State cites no case where the defendant possessed an amount of drugs consistent with personal use, but the variety of drugs alone served as "additional evidence of intent to deliver to support a conviction." *Robinson*, 167 Ill. 2d at 411. In *Robinson*, for example, our supreme court found that possession of 2.2 grams of PCP and 2.8 grams of cocaine may be consistent with personal use. *Robinson*, 167 Ill. 2d at 413. Yet the court specifically cited other evidence beyond the amount or combination of drugs in finding that the evidence supported an inference of intent to deliver: "Forty individual parcels, containing two different types of narcotics, *and the other circumstantial evidence in this case* were sufficient to support the jury's verdict." (Emphasis added.) *Id.* at 414 (noting that defendant was in an apartment that was the subject of anonymous tips of drug sales, and police observed a dozen people come and go from the apartment in a 20-minute period late at night). Similarly, in *Green*, the

recovery of two different drugs, along with a scale and police testimony that the drugs were ready for sale, was enough to erode an inference of personal use and support an inference of intent to deliver. *Green*, 256 Ill. App. 3d at 501.

¶ 20 Our supreme court has found that "[a]s the quantity of controlled substance in the defendant's possession decreases, the need for additional circumstantial evidence of intent to deliver to support a conviction increases." *Robinson*, 167 Ill. 2d at 413. We think it wise to take a similar case-by-case approach as to the combinations of drugs recovered. We thus express no opinion as to whether possession of a large variety of drugs or certain combinations of drugs could be considered inconsistent with personal use and alone support an intent to deliver. Here, however, where the State presented no evidence that possession of 3.1 grams of cocaine and roughly 0.4 grams of heroin was inconsistent with personal use, we must look further to see if the State presented "additional evidence of intent to deliver to support a conviction." *Robinson*, 167 Ill. 2d at 411.

¶ 21 The State next contends that an inference of an intent to deliver can be drawn from what police did not find: drug paraphernalia consistent with personal use. In *People v. White*, an officer testified regarding his familiarity with the type of object used to consume crack cocaine, such as "a round cylinder of some type." *White*, 221 Ill. 2d at 17-18. The officer further testified that the amount of crack cocaine recovered (12 bags totaling 1.8 grams) was inconsistent with personal use, and a second officer noted that the individual rocks were the typical size of those sold on the street for $10 each. *Id.* at 18. Defendant was found with the drugs and $75 in cash in an area "known as a location where illegal drug activity took place on a continuing basis." *Id.* at 19. Our supreme court concluded that a rational trier of fact could have found the evidence sufficient to establish intent to deliver. The court stated that although the defendant "was not carrying a pager, weapon, scale, cutting agent, or police scanner, he was also not carrying any paraphernalia associated with personal use of the cocaine." *Id.* at 20.

¶ 22 Since *White*, we have noted that it is unclear "whether the court considered the lack of drug-using paraphernalia as evidence of intent to deliver or as simply demonstrating that the lack of drug-trafficking paraphernalia was not especially probative in that case." *Sherrod*, 394 Ill. App. 3d at 866. This court has sometimes cited lack of evidence of drug paraphernalia associated with personal use as evidence of intent to deliver, though these cases, like *White*, involve other circumstantial evidence of intent to deliver. See, *e.g.*, *Beverly*, 278 Ill. App. 3d at 802 (finding intent to deliver proved by evidence indicating possession of cocaine packaged for sale, large amount of cash, and lack of drug paraphernalia for personal use). Moreover, unlike *White* and other cases cited by the State, the police officers in this case did not testify as "experts as to the packaging, cost, and typical personal usage of controlled substances." *Sherrod*, 394 Ill. App. 3d at 866 (collecting cases); see also *Clinton*, 397 Ill. App. 3d at 226 (noting that the officers did not testify regarding typical packaging for sale or whether the amount recovered was inconsistent with personal consumption). We are unconvinced, based on our review of these cases, that defendant's possession of an amount of cocaine and heroin consistent with personal use, combined with the absence of drug paraphernalia commonly used for personal consumption, provides sufficient evidence of an intent to deliver in this case. See *Sherrod*, 394 Ill. App. 3d at 867-68

(finding evidence insufficient to support inference of intent to deliver, even though defendant did not have paraphernalia associated with personal use, where defendant was found with $35 and 17 bags of cocaine totaling 1.8 grams, an amount consistent with personal use); *Clinton*, 397 Ill. App. 3d at 226 (finding evidence insufficient to support inference of intent to deliver, where defendant was found with $40 and 13 tinfoil packets of suspected heroin in amount consistent with personal use, but defendant did not have paraphernalia associated with personal use).

¶ 23    While the State argues that two additional pieces of evidence support an inference that defendant intended to deliver the drugs he was carrying, we find this evidence unconvincing. The State first points out that the jury heard evidence that the officers were at the location of defendant's arrest because they had been informed, by a citizen complaint, that narcotics were being sold from a particular address. Courts in Illinois have noted that presence in an area where drug trafficking is common may support an inference that defendant intended to distribute drugs. *White*, 221 Ill. 2d at 20-21 (noting that "[d]efendant was stopped in a high-crime area known for its drug activity," and police were familiar with at least five apartments in which illegal drug sales were ongoing); *People v. Williams*, 358 Ill. App. 3d 1098, 1104 (2005) (noting that "the police observed defendant walking down the street in the middle of the night in a 'high drug-traffic area' "). Much more telling evidence, of course, is testimony regarding what defendant was or was not doing in the drug-trafficking area. Compare *Sherrod*, 394 Ill. App. 3d at 867 (noting absence of evidence that "defendant was in an area where drug sales were common" and further noting that officer specifically testified that he did not see defendant try to sell drugs to anyone), with *Robinson*, 167 Ill. 2d at 413 (police encountered defendant in an apartment, subject to complaint about drug sales, where they watched a dozen people come in and out of the doorway over a 20-minute period). In this case, police observed defendant (and others) *purchase* drugs from the address that was the subject of the complaint regarding drug sales. Defendant was in a drug-trafficking area, but the testimony shows that he came to purchase drugs, not to distribute them.

¶ 24    The State also argues that defendant's possession of a cellular telephone shows that he intended to deliver drugs. In *Robinson*, our supreme court noted that "possession of police scanners, beepers or cellular telephones" may constitute circumstantial evidence of intent to deliver. *Robinson*, 167 Ill. 2d at 408. Since our supreme court's opinion in *Robinson*, delivered nearly 20 years ago, this court has questioned whether possession of a cellular phone alone is probative of anything other than the popularity of mobile communication devices. See *People v. Blan*, 392 Ill. App. 3d 453, 457 n.1 (2009) ("[P]ossession of a cellular telephone has far less force as evidence of intent to deliver than it might have had when *Robinson* was decided in 1995."); *People v. Williams*, 358 Ill. App. 3d 1098, 1107 (2005) (Cook, P.J., dissenting) ("The proliferation of cellular phones is such that the mere possession of one is unlikely to be probative of intent to deliver drugs absent phone records revealing a pattern of short calls or unless defendant had a pager or beeper as well."). We observe that even those cases cited by our supreme court in *Robinson* did not involve possession of a mobile phone alone. *People v. LeCour*, 172 Ill. App. 3d 878, 886 (1988) (testimony of witness who said that he twice contacted defendant by way of defendant's telephone pager, after which defendant agreed to bring 3.3 grams of cocaine to witness at an

arcade); *People v. Bradford*, 239 Ill. App. 3d 796, 800 (1993) (cellular telephone and a programmable scanner set to radio frequency used by police found in automobile passenger compartment).

¶ 25    The State presents a single case where the possession of a cellular phone, without another device, like a police scanner, or some evidence that the cellular phone was used in a drug transaction, was found to support of inference of intent to deliver. In *People v. Williams*, the defendant was found with 1.6 grams of cocaine in 12 packets, along with a cellular phone. *Williams*, 358 Ill. App. 3d at 1102. An officer with expertise in narcotics distribution also testified that the drugs were packaged for sale, specifically as $20 rocks, and his opinion was that defendant intended to deliver the cocaine. *Id.* at 1103. The officer also testified that defendant was found in the middle of the night in a high drug-trafficking area. *Id.* at 1104. Over a dissent, the court found that the evidence supported an inference that defendant had an intent to deliver the drugs, noting that defendant was found in a high drug-trafficking area, he had a cellular phone, and the State presented extensive testimony that the drugs were packaged for sale. *Id.*

¶ 26    In contrast to *Williams*, the State here did not present any expert testimony that the drugs recovered were packaged for sale. Even if the drugs were packaged for sale, the evidence suggests that at least some of those drugs had just been sold to defendant. Under these circumstances, one would expect that the seller would have the drugs packaged for sale when defendant purchased them. Without other evidence, the packaging would not support an inference that defendant intended to resell the drugs. While the court in *Williams* noted that the defendant was in a drug-trafficking area, here again the evidence reveals that defendant came to a drug-trafficking area in order to purchase a small amount of drugs, not to sell drugs. We must evaluate each case on its own facts, and beyond the possession of a cellular phone, the nature and quality of the circumstantial evidence here does not correspond to the evidence put forth in *Williams*. We also note that the court in *Williams* did not elaborate on how the defendant's possession of a cellular phone contributed to its holding; the court at least suggested that the packaging evidence alone was sufficient evidence of intent to deliver. See *id.* at 1102 (noting that "*in appropriate circumstances*, packaging alone might be sufficient evidence on intent to deliver" (emphasis in original and internal quotation marks omitted) and stating that "[s]uch circumstances exist in the case at bar"). In this case, we conclude that without any further evidence that the cellular phone was used to sell drugs, the possession of the cellular phone provides little, if any, support to a finding that defendant intended to distribute drugs. See *Blan*, 392 Ill. App. 3d at 457 n.1; *Williams*, 358 Ill. App. 3d at 1106 (Cook, P.J., dissenting).

¶ 27    In sum, all that was shown at trial is that defendant was carrying an amount of cocaine and heroin consistent with personal use, he came to a drug house to purchase a small amount of drugs, and he had a cellular phone. The State presented no testimony as to drug purity or the significance of how the drugs were packaged. Defendant was found without any cash, and while he had no drug paraphernalia consistent with personal use, he also had no drug paraphernalia associated with selling drugs. We conclude that this evidence, with all inferences drawn in favor of the State, does not provide adequate support for a finding, beyond a reasonable doubt, that defendant intended to deliver drugs. Therefore, pursuant to

Illinois Supreme Court Rule 615(b)(3), we reduce defendant's conviction to possession of a controlled substance. Accordingly, we vacate defendant's sentence and remand the cause to the trial court for a new sentencing hearing.

¶ 28                                    Consent to Search

¶ 29        Defendant next argues that the trial court should have granted his motion to quash arrest and suppress evidence. A motion to suppress presents mixed questions of law and fact. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003). Factual findings made by the circuit court will be upheld on review unless such findings are against the manifest weight of the evidence. *Id.* If we accept the findings of fact made by the circuit court, we then review *de novo* whether suppression is warranted under those facts. *Id. De novo* review is also appropriate, then, where, as here, neither the facts nor the credibility of witnesses is disputed. *People v. Anthony*, 198 Ill. 2d 194, 201 (2001).

¶ 30        The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Reasonableness in this context generally requires a warrant supported by probable cause, though a warrantless search conducted with a defendant's voluntary consent does not violate the fourth amendment. *Anthony*, 198 Ill. 2d at 202 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) and *People v. Bull*, 185 Ill. 2d 179, 197 (1998)). The constitutionality of a consent search turns on two questions: "First, it must be determined whether or not consent was given and then, second, whether or not that consent was in fact voluntary." *People v. Parker*, 312 Ill. App. 3d 607, 616 (2000). Here, defendant focuses only on whether consent was given, arguing that his words and actions were "far too ambiguous" to allow the officers to infer consent.

¶ 31        "[W]hen a court is deciding whether consent was given ***, the circumstances must have been such that the police could have reasonably believed they had been given consent [to search]." *People v. Henderson*, 142 Ill. 2d 258, 299 (1990); *People v. Williams*, 383 Ill. App. 3d 596, 626 (2008). No specific words (or any words at all) are required: a defendant may convey consent to search by nonverbal conduct alone. *Anthony*, 198 Ill. 2d at 202. Our supreme court has cautioned, however, that "[i]n the case of nonverbal conduct, where dueling inferences so easily arise from a single ambiguous gesture, the defendant's intention to surrender this valuable constitutional right should be unmistakably clear." *Id.* at 203.

¶ 32        In this case, the officers observed more than nonverbal conduct. When the officers approached defendant, asking if they could speak with him, defendant said in response, "Let me show you what I got." As he made the statement, defendant pointed his right hand at his right front pants pocket. One of the officers then recovered plastic bags of suspected heroin. Defendant's words can reasonably be understood to mean that he would freely reveal the contents of his pocket to the officers; his words were clear and his gesture was specific.

¶ 33        Defendant claims that his words are better understood as a "preemptive attempt to avoid a search." That is, when he said "Let me show you what I got," he really meant–and the officers should have reasonably inferred–that defendant was actually trying to prevent a search. That was what the court found in *People v. Green*, 358 Ill. App. 3d 456 (2005), on

which defendant relies, but the facts of that case bear little resemblance to the facts here. In *Green*, an officer repeatedly asked to search a suspect's backpack, telling her that otherwise he would get a search warrant. 358 Ill. App. 3d at 462. Defendant twice refused to allow a search, became " 'irate,' " and then tried to "convince [the officer] not to look into the backpack by showing him that the backpack actually did contain clothing." (Emphasis omitted.) *Id.* at 462. When the defendant pulled some clothing out the backpack, the officer observed glass jars that the officer recognized as containing methamphetamine. *Id.* at 459. The appellate court found that defendant did not impliedly consent to a search by opening the backpack; rather, "by protesting that she had clothes in the backpack and showing that there was clothing within, defendant was implicitly attempting to avoid a search by selectively showing nonincriminating items." (Emphasis omitted.) *Id.* at 462. As the court explained, the fact that the officer happened to see into the open backpack was "not an indication that defendant was inviting him to search it." *Id.*

¶ 34		The facts in this case do not fit the *Green* mold. In *Green*, the defendant's words (twice refusing to allow a search), paired with her actions (an attempt to reveal only clothes from a backpack) do not give rise to a reasonable inference of consent. Here, defendant's words (an offer to show the officers "what I've got") and his actions (specifically pointing to his right pants pocket) do give rise to a reasonable belief that defendant consented to a search. Defendant acknowledges that the record does not show why he sought to avoid a search; he states that perhaps he was hoping to fool the officers by displaying something innocent or by displaying only a small amount of heroin in hopes that the officers would let him go. We would go further: defendant must rely on a speculative view of his statement (unsupported by any facts) in order to create an ambiguity from his words where there is none. It is of course true that the officers could have confirmed defendant's consent with further questioning, but our supreme court has directed that such confirmation is not required where, as here, defendant's words and actions can reasonably be understood to convey consent to search. See *People v. Henderson*, 142 Ill. 2d 258, 299 (1990) (finding that conduct of defendant's mother–stepping back from the open door and pointing toward defendant's bedroom–"was a wordless invitation to enter, and faced with this conduct the officers need not have asked for permission to enter and received verbal confirmation"). We conclude that, with defendant's clear words and a gesture to his right pants pocket, the officers could reasonably infer that defendant consented to a search.

¶ 35		Impeachment by Omission

¶ 36		Defendant argues that the trial judge erred by refusing to allow him to impeach a State witness by omission. During his cross-examination of Officer Malinowski, defendant asked why several months before, the officer had refused to make any statements "about this case right here" to an assistant State's Attorney. Defendant now argues that this was legitimate impeachment by omission because "had Malinowski seized drugs from [defendant], as he claimed [at trial], he would have had no reason to refuse to tell the prosecutor." The parties agree that defendant preserved this issue for review by including it in his posttrial motion.

¶ 37		Cross-examination is generally limited in scope to the subject matter of the direct

examination of the witness and to matters affecting the credibility of the witness. *People v. Terrell*, 185 Ill. 2d 467, 498 (1998). However, "[a] defendant's rights under the confrontation clause are not absolute. Rather, 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (Emphasis in original.) *People v. Jones*, 156 Ill. 2d 225, 243-44 (1993) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). Specifically, "a trial court may impose reasonable limits on cross-examination 'based on concerns about, among other things, *** interrogation[s] that [are] *** only marginally relevant.' " *People v. Velez*, 2012 IL App (1st) 101325, ¶ 62 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Our supreme court has repeatedly held that "a trial judge retains wide latitude to impose reasonable limits on such cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance." *People v. Kliner*, 185 Ill. 2d 81, 134 (1998); *People v. Blue*, 205 Ill. 2d 1, 13 (2001). "The latitude permitted on cross-examination is a matter within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant." *Kliner*, 185 Ill. 2d at 130.

¶ 38        Prior silence may be used to impeach a witness if "(1) it is shown that the witness had an opportunity to make a statement, and (2) under the circumstances, a person normally would have made the statement." *People v. Clay*, 379 Ill. App. 3d 470, 481 (2008); *People v. Williams*, 329 Ill. App. 3d 846, 854 (2002). When defendant questioned Malinowski about why he "refused to speak up" regarding "this case right here," defendant presented a report from a March 2009 investigation of defendant for possessing a gun within the Cook County jail. The report states that an assistant State's Attorney investigating the jail incident "contacted the Chicago Police Department's (4th District) Tactical Unit and spoke to the arresting officers on Bennie Ellison's original case." The report further states that "once informed of the situation the officers refused to make a statement." After a sidebar, the judge found that the report related to the case alleging that defendant had brought a gun inside the jail, so he disallowed defendant's question.

¶ 39        We see no error in the trial court's ruling. Even if we assume that defendant could establish that Officer Malinowski (who is not even listed as an arresting officer on defendant's arrest report) was the 4th District Tactical Unit officer who refused to speak to the assistant State's Attorney, that "omission" would not impeach Malinowski's trial testimony regarding his recovery of drugs from defendant. While defendant acknowledges that "most of" the report relates to allegations that defendant sneaked a gun in the county jail, he claims that the prosecutor contacted the 4th District on Ellison's "original case" to ask about the recovery of drugs from defendant. We agree with the trial court that this is not a fair reading of the report.[1] The report states that the prosecutor contacted some unknown

---

[1]Defendant only references the portion of the report quoted above, and we rely on defendant's recitation as set forth in his brief. Defendant's opening brief noted that "[t]he relevant page of this report will be certified as a supplemental record." The State noted in its brief that defendant had provided it with one page of the report, but the report had not been included as part

"officers on Bennie Ellison's original case" and "once informed of the situation the officers refused to make a statement"; it does not state that the prosecutor contacted those officers to discuss the drug case, as defendant claims. We agree with the trial court that the assistant State's Attorney tasked with investigating how defendant allegedly brought a gun into the Cook County jail after being searched by the police and jail personnel was not asking questions related to the drugs that the officers recovered from defendant. Defendant's attempt to impeach by omission simply would not "discredit or destroy" Officer Malinowski's direct testimony. (Internal quotation marks omitted.) *People v. Hernandez*, 313 Ill. App. 3d 780, 786 (2000). Because defendant's questioning related to irrelevant material and would have led to confusion of the issues for the jury, the trial court did not abuse its discretion in limiting cross-examination. *Kliner*, 185 Ill. 2d at 134; *Velez*, 2012 IL App (1st) 101325, ¶ 62.

¶ 40                    Standby Counsel and Access to Law Library

¶ 41       Defendant next asserts that the trial court improperly denied his request for standby counsel to assist him with his *pro se* representation, and the trial court "should have done more" to ensure that defendant had access to a law library. The State initially argues that defendant has forfeited these issues by failing to include them in his posttrial motion. Even assuming these issues have been preserved for appeal, we find no error in the trial court's rulings.

¶ 42       A *pro se* defendant does not have a right to standby counsel, but since there is no state statute or court rule to the contrary, such appointment is permissible. *People v. Ware*, 407 Ill. App. 3d 315, 349 (2011); *People v. Gibson*, 136 Ill. 2d 362, 374 (1990). "Relevant criteria appropriately considered by a trial court in deciding whether to appoint standby counsel to assist a *pro se* defendant in a criminal case include the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *Gibson*, 136 Ill. 2d at 380. The decision whether to appoint standby counsel is left to the trial court's broad discretion and will not be reversed absent an abuse of that discretion. *Id.* " 'An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' [Citation.]" *Ware*, 407 Ill. App. 3d at 349. This court has recently reiterated that "no trial court in Illinois has been reversed for exercising its discretion to *not* appoint standby counsel, and this absence of reversals appears consistent with nationwide experience." (Emphasis omitted and in original.) *People v. Pratt*, 391 Ill. App. 3d 45, 57 (2009) (quoting *People v. Williams*, 277 Ill. App. 3d 1053, 1061 (1996)).

¶ 43       Defendant first argues that he is entitled to a new trial because the trial court imposed a blanket policy of not allowing standby counsel, rather than exercising its discretion in denying standby counsel for defendant. Defendant first points to the trial judge's remarks

---

of the record on appeal. The report was not certified as a supplemental record. In the absence of a sufficiently complete record, we presume that the trial court's ruling had a sufficient legal and factual basis and will resolve all doubts against the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984); *People v. Fair*, 193 Ill. 2d 256, 264 (2000) (applying *Foutch* in criminal appeal).

when defendant decided to go *pro se*:

> "THE COURT: Okay. Knowing all of that and knowing what I have just told you, do you still wish to represent yourself?
>
> THE DEFENDANT: Yes, with assistance of counsel.
>
> THE COURT: Pardon me?
>
> THE DEFENDANT: With assistance of counsel.
>
> THE COURT: No, you only represent yourself. Either you represent yourself or you can have any attorney. You can't have it–
>
> THE DEFENDANT: All right. Then I–
>
> THE COURT: Listen, listen to me when I am talking.
>
> THE DEFENDANT: I'm listening.
>
> THE COURT: You're not going to have an attorney one minute and then go by yourself the next minute, okay.
>
> And I am not going to be your attorney. I can't help you try your case. You are going to be held to the same standard as if you were an attorney for rules of evidence and all of those types of things.
>
> Do you understand that?
>
> THE DEFENDANT: Yes."

¶ 44 Rather than impose a blanket policy against standby counsel, we find that the trial court attempted to explain that a criminal defendant proceeding *pro se* must be prepared to do so without legal assistance. "The right of self-representation does not carry with it a corresponding right to legal assistance; one choosing to represent himself must be prepared to do just that." *People v. Simpson*, 204 Ill. 2d 536, 562 (2001); *People v. Smith*, 377 Ill. App. 3d 458, 461 (2007). We see no error in the trial court's explanation that defendant had no right to "assistance of counsel" as a *pro se* criminal defendant, especially at the time when he was making an important choice whether to represent himself. See *People v. Trotter*, 254 Ill. App. 3d 514, 526 (1993) (finding no error where court told defendant that his "only two choices were representation by counsel or *pro se*, not anything in between"); see also *People v. Williams*, 277 Ill. App. 3d 1053, 1059 (1996) (noting that the appointment of standby counsel is "often is viewed by defendants as an important factor in making the decision to proceed *pro se*" and "trial courts ought not act as 'enablers' for this unwise course of conduct").

¶ 45 Defendant next argues that the judge hearing his motion to quash imposed a blanket policy against standby counsel. At the outset of the hearing on the motion, defendant told the judge that he wanted "someone to advise me" as far as "representing this motion if possible." The judge responded, "If you want an attorney to represent you, then of course you would have to be receptive to their legal advice." When defendant responded that he wanted an attorney to "litigate this *** motion *** as it [has] been written," the court inquired further:

> "THE COURT: *** It doesn't sound like you're receptive to their legal advice, it sounds like you're saying that you want them to litigate the motion that you prepared–

THE DEFENDANT: Right.

THE COURT: –and not necessarily a motion that would be meritorious or that will be legally sound. So my question to you is, are you receptive to the representation of an attorney?

THE DEFENDANT: I mean, no, if they not going to *** just like you just said *** I'm not receptive to it if they are not going to read off things in the motion just as well *** because they already been written.

THE COURT: Okay."

Defendant continued that if an attorney would not "litigate my motion which I have written up *** the way I have already written [it] up *** counsel before refused to do so, so, I mean, I'm willing to take the chance *** to try and learn."

¶ 46    While defendant here asked for assistance with his motion, his responses to the judge's inquiries reveal that he was more interested in having an attorney represent him during the motion hearing, so long as defense counsel would present the defendant's motion as defendant saw fit. Standby counsel may assist a *pro se* defendant "in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete" and may also help "ensure the defendant's compliance with basic rules of courtroom protocol and procedure." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). The trial court has "broad discretion *** to determine the nature and extent of standby counsel's involvement" (*People v. Redd*, 173 Ill. 2d 1, 38 (1996)), and we find no error in the motion judge's decision not to appoint standby counsel, where defendant wanted counsel to step in and litigate a motion as defendant had prepared it.

¶ 47    We are left with the trial court's denial of defendant's written motion for standby counsel. Defendant faults the trial court for not exploring the *Gibson* factors on the record; he argues that the failure to do so can be viewed as the failure to exercise discretion. That the court did not issue a detailed explanation of his denial of defendant's motion for standby counsel does not transform that denial into a blanket policy. See *People v. Ware*, 407 Ill. App. 3d 315, 351 (2011) (finding no blanket policy of denying standby counsel where the court stated, " 'the court in its discretion is not going to appoint stand-by counsel,' " but did not mention or discuss the *Gibson* factors). The trial court is presumed to know and properly apply the law, and there is nothing in the record that affirmatively indicates that the judge did not properly apply the law. See *People v. Phillips*, 392 Ill. App. 3d 243, 265 (2009) ("Although the trial court in the case at bar did not recite [the *Gibson*] factors on the record, a trial court is presumed to know the law and apply it properly."); see also *People v. Redmond*, 265 Ill. App. 3d 292, 304 (1994) ("[T]he Illinois Supreme Court has yet to hold that the trial judge's failure to exercise his discretion, without more, necessarily requires reversal.").

¶ 48    Defendant maintains that we must order a new trial because an exploration of the *Gibson* factors reveals that the trial court should have appointed standby counsel. We disagree, for our review of the *Gibson* factors does not show that the trial court's denial of standby counsel was arbitrary or unreasonable. As to the nature and gravity of the charge, we

generally agree that the charge of possession with intent to deliver can be described as "serious," but this court has found no abuse of discretion in denying standby counsel where the charges were more severe than in this case. *People v. Pratt*, 391 Ill. App. 3d 45, 48 (2009) (no abuse of discretion in not appointing standby counsel for defendant convicted of first degree murder and sentenced to 40 years in prison); *Ware*, 407 Ill. App. 3d at 351-52 (finding no abuse of discretion in not appointing standby counsel for defendant convicted of attempted first degree murder and sentenced to 25 years in prison); *cf. Gibson*, 136 Ill. 2d at 380-81 (noting that standby counsel was appropriate in a capital case). While defendant argues that his case was "moderately complex" because it spanned two days and included expert testimony, the facts were not especially complex. Defendant was charged with possession of a controlled substance with the intent to deliver based on the narcotics that were found on his person. The first day of trial consisted entirely of jury selection; the second day started at 10:30 a.m., with deliberations beginning by 2:45 p.m. A forensic chemist did testify as an expert, but defendant's theory did not involve challenging the chemical composition of the narcotics.

¶ 49     As to defendant's ability and experience, defendant had a high school education and had a long history with the criminal justice system. Defendant claims that the only sentences he received were the result of convictions pursuant to guilty pleas, but the record only reveals that one of defendant's seven convictions was the result of a guilty plea. We cannot tell from the record whether the other six convictions were the result of a plea or a trial. Apart from his "experience" with the criminal justice system, defendant demonstrated the ability to conduct himself during the proceedings. In the months before his trial, defendant engaged in discovery and made written and oral motions. At trial, he made an opening statement and closing argument, cross-examined witnesses, and participated in jury selection.

¶ 50     Defendant cites strategic decisions he made, or failed to make, at trial as evidence that he was "prejudiced" by lack of standby counsel and a new trial is therefore required. For example, defendant now argues that a trained lawyer may have sought a lesser-included simple-possession instruction; defendant sought to challenge the testimony of the officers and establish that their account was faulty, though he did argue in closing that the State had failed to show that he intended to deliver the drugs. Defendant also contends that counsel may have also decided to strike a prospective juror who had recently been burglarized by men who left drug paraphernalia at the scene; defendant chose not to strike the juror, though he exercised five other peremptory challenges.

¶ 51     It is true that standby counsel is not *barred* from offering strategic advice to the defendant when outside the presence of the jury, so long as "the *pro se* defendant is allowed to address the court freely on his own behalf and if disagreements between counsel and the *pro se* defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel." *McKaskle*, 465 U.S. at 179. It does not follow, however, that trial court is required to appoint standby counsel whenever the trial court believes that a *pro se* defendant's strategic choices vary from those of a trained lawyer. "When defendant proceeds *pro se*, he controls the substance of his defense and, if appointed, standby counsel's duty is to assist in routine procedural matters and to explain courtroom protocol." *People v. Redmond*, 265 Ill. App. 3d 292, 306 (1994) (finding no prejudice to

defendant where "[t]he instances of prejudice defendant asserts he suffered all arose out of substantive and strategic[ ] decisions and were not the result of procedural obstacles he was unable to overcome"). Indeed, the Supreme Court has cautioned that standby counsel must be careful to ensure that defendant preserves "actual control over the case he chooses to present to the jury": "If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right [to self representation] is eroded." (Emphasis in original.) *McKaskle*, 465 U.S. at 178; see also *Williams*, 277 Ill. App. 3d at 1059 ("[B]ecause a defendant's right to represent himself has constitutional roots [citation], the conduct of standby counsel might inadvertently infringe upon that right."). We find no support for defendant's claim that in evaluating the trial court's discretionary ruling on whether to appoint standby counsel, we should inquire, with the benefit of hindsight, whether defendant pursued a strategy that a trained lawyer might not pursue.

¶ 52 Defendant chose to proceed without counsel, and he therefore had the right and the responsibility to control the case he chose to present to the jury. *Gibson*, 136 Ill. 2d at 377. With that decision did not come a right to standby counsel. *Simpson*, 204 Ill. 2d at 562. Upon review of the factors outlined in *Gibson*, we conclude that the trial court did not abuse its considerable discretion when it declined to appoint standby counsel.

¶ 53 In a related argument, defendant claims that we should grant him a new trial because he did not have adequate access to a law library. "The constitutional right of access to the courts requires prison authorities to assist inmates by providing adequate law libraries ***." *People v. Banks*, 161 Ill. 2d 119, 141 (1994) (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)).

¶ 54 Defendant asserted his right to proceed *pro se* on September 1, 2009. At a hearing on September 15, 2009, defendant requested a court order and access to the law library three days a week. When the defendant argued that the trial court was "not giving [him] enough legal time to prepare," the court asked how much time defendant would need and granted him a continuance for one month, as defendant requested. On October 15, 2009, the next hearing date, the State gave the defendant discovery. When defendant asked to continue the case to November 16, 2009, so that defendant could "read everything and prepare myself," the court agreed. The court noted that on that day the court would pick a trial date, so defendant should "be thinking along those terms." Defendant again requested "stipulations" for law library access on Monday, Wednesday and Friday. The court agreed with that request, entering an order that "defendant permitted to visit law library Monday Wednesday or Friday subject to security consideration of jail."

¶ 55 On December 9, 2009, defendant told the judge that jail personnel were not honoring his orders, telling him "F*** that court order." The judge signed another order for law library access and continued the case to hear the motion the following week. On December 18, 2009, the motion to quash was heard before a different judge. When the motion judge asked defendant if he was ready to present his motion, he stated that he was ready to proceed. Only after the motion was denied did defendant again claim that he it had been over a month since he had been to the law library. At the next hearing, January 4, 2010, the trial court issued another order that defendant be permitted to visit the law library on Monday, Wednesday,

or Friday subject to the security concerns of the jail.

¶ 56     While both parties claim support from our supreme court's decision in *Banks*, we agree with the State that the trial court did not deny defendant access to the court system under the principles announced in *Banks*. In *Banks*, a capital case on direct review to our supreme court, the defendant complained that he was only allowed to access the law library for one hour on the day prior to court hearings. *Banks*, 161 Ill. 2d at 138. The court recounted the history of defendant's requests for access to the library:

"On August 15, 1988, defendant began to complain of inadequate access to the jail law library. The trial judge accommodated defendant's request for additional library time, and ordered that defendant be allowed to use the law library four hours each week. Defendant continued to sound complaints that the correctional officers refused to comply with the judge's order for additional library time. The trial judge granted defendant a continuance after each complaint, rather than forcing him to proceed while unprepared. After November 9, 1989, however, defendant made no further complaints, except to explain once that he was filing a handwritten rather than typed motion because he was unable to use the law library." *Id.* at 139.

In finding no violation of defendant's right to self-representation, the *Banks* court noted that "when defendant did complain of inadequate access to the law library, the trial judge always granted defendant a continuance so that he could adequately prepare his case." *Id.* at 141. The same is true here. When defendant complained of inadequate access to the law library, the trial court issued a court order for additional time in the library and granted a continuance. Defendant has not cited a single instance where he claimed he did not have proper time for preparation or access to the law library and was then forced to proceed.

¶ 57     It is true that after his motion to quash was denied, defendant claimed that he had not had access to the law library for over a month. But he did not complain about inadequate access to the law library or seek a continuance when it came time to present the motion to quash; he instead pushed forward and presented the motion. We note that defendant had prepared a typed motion to quash arrest and suppress evidence, with citations to legal authority, which suggests that defendant in fact had access to the library to prepare his motion. When defendant complained to the court after he lost his motion to quash, the trial court again entered an order granting him access to the law library, and the court continued the case. At the time of trial, defendant did not complain about law library access again or ask for a continuance for more time to prepare.

¶ 58     Defendant points out that the *Banks* court also found "it significant that defendant did not voice any complaints of inadequate access to the law library for over 20 months prior to trial." *Id.* Defendant claims that his case is different, for he "repeatedly protested the jail's failure to give him access." The problem with defendant's argument is that the defendant in *Banks* also repeatedly complained about lack of access to the law library, but his complaints stopped in the months leading up to trial. In this case, as in *Banks*, while defendant initially complained about inadequate access to the law library, when it came time to present his motion and to proceed with trial, defendant did not seek a continuance or seek time in the law library. Thus, like the trial court in *Banks*, the trial court here never had a chance to

-17-

rectify any lack of access to the law library by issuing an order granting access and continuing the case.

¶ 59　We also agree with the State that like the defendant in *Banks*, he cannot demonstrate that he was prejudiced because he lacked adequate access to the law library. The court in *Banks* noted that defendant had the ability to file motions in the time leading up to trial and that the defendant had "failed to make any specific allegations of fact to show that he was prejudiced." *Id.* Here, defendant focuses his claim on the lack of library access before his motion to quash, but as noted above, defendant was able to submit a typed motion to quash with legal citations and cross-examine the officers at the motion to quash hearing. Apart from the motion to quash, defendant was able to file other motions, engage in jury selection, strike six jurors, make opening and closing statements, voice objections, and cross-examine witnesses. We conclude that defendant has not shown that he was denied access to the courts.

¶ 60　　　　　　　　　　　　　　　　CONCLUSION

¶ 61　We reduce defendant's conviction for possession of a controlled substance with intent to deliver to possession of a controlled substance. We vacate defendant's sentence and remand for resentencing.

¶ 62　Reversed and remanded.