# Illinois Official Reports

## Appellate Court

---

### *People v. Starks*, 2019 IL App (2d) 160871

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH L. STARKS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-0871 |
| Filed | June 28, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 15-CF-307; the Hon. Linda S. Abrahamson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and R. Christopher White, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, David J. Robinson, and Marshall M. Stevens, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.<br>Justices Jorgenson and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a jury trial, defendant, Keith L. Starks, was convicted of one count of unlawful possession of a controlled substance with intent to deliver within 1000 feet of a church (720 ILCS 570/407(b)(1) (West 2014)) and one count of driving while his license was revoked (625 ILCS 5/6-303(a) (West 2014)). Following a simultaneous bench trial, defendant was also convicted of one count of aggravated unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2014)). The trial court sentenced defendant to eight years' imprisonment on the drug conviction and five years' imprisonment on the weapon conviction, to be served concurrently. Defendant argues that his drug conviction should be reduced to simple possession, because the evidence did not prove beyond a reasonable doubt defendant's intent to deliver. Defendant also argues that his weapon conviction should be reversed because a baton does not qualify as a "bludgeon" within the meaning of the statute. For the following reasons, we affirm.

¶ 2 **I. BACKGROUND**

¶ 3 On May 6, 2016, defendant was charged in a four-count indictment relating to actions alleged to have occurred on February 24, 2015. Count I alleged unlawful possession of a controlled substance with intent to deliver within 1000 feet of a church, in that, "while within 1000 feet of a Church, Elgin Community Church, [defendant] knowingly and unlawfully possessed with the intent to deliver to another, one or more grams, but less than 15 grams of a substance containing cocaine [(a Class X felony)]." Count II alleged aggravated unlawful possession of a weapon, in that defendant, "who has been convicted of a felony[,] knowingly possessed a bludgeon, being a metal expandable baton [(a Class 3 felony)]." Count III alleged unlawful possession of a controlled substance, in that defendant "knowingly and unlawfully possessed less than 15 grams of a substance containing cocaine [(a Class 4 felony)]." Count IV alleged that defendant "operated a motor vehicle at a time when [defendant's] driver's license was suspended or revoked [(a Class A misdemeanor)]."

¶ 4 On April 6, 2016, a "reindictment" was issued. Counts I, III, and IV were realleged as in the original indictment, but count II was elevated to a Class 2 felony, based on defendant's prior Class-2-or-greater drug conviction.

¶ 5 On April 8, 2016, the trial court granted defendant's motion to sever count II. Defendant waived a jury trial on count II, and the State nol-prossed count III.

¶ 6 On April 11, 2016, a bench trial was held on count II, aggravated unlawful use of a weapon, and a jury trial was held on counts I and IV, alleging unlawful possession of a controlled substance with intent to deliver within 1000 feet of a church and driving while his license was revoked, respectively.

¶ 7 Detective Tom Wolek of the Elgin Police Department testified as follows. Wolek had worked for the department for 20 years and was a detective with the "special investigations division." On February 24, 2015, Wolek conducted in a narcotics investigation with Officer Shaun Schroeder, Detective Gorcowski, and Sergeant Bianchi. Wolek drove an unmarked sport-utility squad vehicle and the others rode along as passengers. Wolek wore a bulletproof vest with police markings on the front and back. Wolek drove to the area of Mark Avenue and Mildred Avenue and began following a Honda Civic. The Civic turned onto Mildred Avenue

and then proceeded to McLean Boulevard. The driver of the Civic did not activate the car's turn signal at least 100 feet before turning onto McLean. Wolek continued to follow the Civic and then attempted to conduct a traffic stop by activating his vehicle's flashing lights. But the Civic did not pull over; instead it continued on McLean and turned into Hooper's Sports Bar's parking lot. "Basically, [the Civic] drove around the entire bar, the front, the side and the back and then came back out to the front." When the Civic was near the back of the bar, Wolek activated his vehicle's spotlight and siren. But the Civic did not stop. Instead, it returned to the area in front of the bar, started heading back toward McLean, and then stopped.

¶ 8　　Wolek approached the driver's window of the Civic with his gun out of its holster for "safety," because it was suspicious that the vehicle had not stopped immediately. Wolek ordered the driver, defendant, to exit the vehicle. Wolek handcuffed defendant because Wolek knew that defendant's driver's license had been revoked. Gilberto Feliciano was in the front passenger seat of the Civic. After Wolek and Officer Jordan Rapacz handcuffed defendant, they searched him and found "a box of plastic [sandwich] baggies [and] several loose plastic baggies." Defendant was then taken to the Elgin Police Department.

¶ 9　　When Wolek searched the Civic, he found a large Ziploc sandwich bag on the driver's-side floorboard and a sandwich bag "containing suspect[ed] drugs [appearing] white in color" on the passenger's-side floorboard. Wolek also recovered a dark-colored jacket on the driver's seat, near the center console. Inside the jacket, Wolek found a metal, expandable baton. The baton was similar to batons issued to police officers "for use of force [and] protection." All the items Wolek found were given to Officer Schroeder.

¶ 10　　At the police station, Wolek advised defendant of his *Miranda* rights and defendant signed a *Miranda* waiver form, which the trial court admitted into evidence. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Wolek testified that defendant told him that he had been with Feliciano at a relative's house shortly before the traffic stop. Defendant told Wolek that he was driving Feliciano's car because Feliciano was experiencing a medical issue that prevented Feliciano from driving. Defendant also told Wolek that he did not immediately stop the car because he was scared and that the drugs were not his. But defendant admitted to Wolek that the plastic bags found on his person belonged to him, as well as the jacket and the baton.

¶ 11　　On April 5, 2016, Wolek and Detective Craig Tucker, a narcotics investigator, went back to the parking lot where the traffic stop had occurred, and they measured the distance between the location of defendant's Civic and the nearby Elgin Community Church, using a measuring wheel. The distance measured was less than 1000 feet.

¶ 12　　The police video of the traffic stop was played in court. The trial court admitted into evidence all the items found at the scene of the traffic stop and a certified copy of defendant's driver's abstract, which showed that defendant's license was revoked at the time of his arrest.

¶ 13　　Schroeder testified as follows. Schroeder assisted Wolek with the traffic stop of defendant. Schroeder approached the passenger side of defendant's car, had Feliciano exit the car, and, upon searching him, discovered five "fake" $20 bills in Feliciano's possession. After Schroeder completed his search of Feliciano, Feliciano started to shake and convulse. Feliciano told Schroeder that he had epilepsy and that he had not taken his medication. Feliciano was taken to the Elgin police station and then to the hospital.

¶ 14　　After Feliciano left the scene, Schroeder looked inside the passenger side of the Civic and saw "a medium-size clear plastic knotted bag" on the floor. The bag contained "various clear plastic knotted bags containing an off-white rocky substance." Schroeder took the bag to the

police station and gave it to Tucker. Wolek had given Schroeder a jacket, a collapsible baton, and a medium Ziploc bag, all of which Schroeder also gave to Tucker.

¶ 15 Feliciano testified as follows. On the day of the incident, he drove the Civic, picked defendant up in the Civic, and asked defendant to drive, explaining that he was not feeling well. Allan Fox owned the Civic. When defendant saw the police lights, he handed Feliciano "what looked like a bag of drugs *** [i]t was like a sandwich, sandwich-like bag, and there was a bunch of other little baggies inside of it. It was clear plastic." Feliciano did not take the bag of drugs. Feliciano had two retail theft cases pending—one in McHenry County and the other in Kane County—in which he pleaded guilty and had been placed in treatment alternative court. Feliciano had not been offered anything from the prosecutor in this case for his testimony.

¶ 16 Tucker testified as follows. On the night in question, he received from Schroeder "one baggy that contained another plastic baggy that contained several little plastic baggy corners, each filled with suspect[ed] cocaine." There were 20 little plastic bag corners. Tucker weighed all 20 plastic bag corners; they weighed 15.2 grams. Tucker field-tested the contents, placed the evidence into an envelope, sealed it, and brought it to a locked evidence storage room. He followed the same procedure for the other evidence he received from Schroeder.

¶ 17 Illinois State Police forensic scientist Martin Skelcy testified as follows. He received 20 hand-tied small plastic bags from officer Jim Malone. These 20 bags, which contained a rock-like substance, weighed 9.9 grams. The contents of 15 of the bags weighed 6.1 grams. Skelcy did not weigh the contents of the remaining five bags. After testing the contents of each of the 15 bags, Skelcy concluded that the bags contained cocaine.

¶ 18 Over defendant's objection, James Bisceglie of the Elgin Police Department's technical investigations unit testified as follows as an expert "in the area of drug investigations, delivery, [and] possession with intent to deliver." Bisceglie reviewed the police reports, the physical evidence, and the lab reports, and he spoke to the officers involved in the case. He did not participate in the case. To form his opinion as to defendant's intent, Bisceglie considered the totality of the circumstances and items of evidence in the case, including information that experts would commonly use, such as the weight of the drugs, the way the drugs were packaged, the lack of user paraphernalia, the presence of cash, and the presence of a weapon. Bisceglie opined that, "typically, if someone is packaging narcotics for sale, it is going to be split up into more than one baggy, more than one plastic bag to sell to more than one person. If it is a use amount, typically *** it may be in one bag and [the] user [him]self is going to split that up into different amounts to use at different periods of time." Bisceglie also opined that crack cocaine is typically packaged by cutting off the corners of a sandwich bag and that the bag is "tied up in a very fine little knot where the crack cocaine is in the corner of the bag." Bisceglie opined that the presence of additional bags was consistent with defendant being a drug dealer, because a drug dealer might have extra packaging on him to "to package drugs at a later time." The lack of user paraphernalia and the presence of a weapon—the baton—were consistent with defendant being a dealer rather than a user. The dollar value of the drugs in this case, approximately $1000, was inconsistent with personal use.

¶ 19 Following Bisceglie's testimony, the State rested. Defendant moved for a directed verdict regarding possession with intent to deliver, which the court denied. Defendant rested without presenting evidence. On April 12, 2016, the jury found defendant guilty of unlawful possession of a controlled substance with intent to deliver within 1000 feet of a church and driving while

his license was revoked, and the trial court found defendant guilty of aggravated unlawful possession of a weapon by a felon.

¶ 20 On May 11, 2016, defendant filed a motion to reconsider or for a new trial, which the trial court denied.

¶ 21 On September 27, 2016, the trial court sentenced defendant to an eight-year prison term for his conviction of unlawful possession of a controlled substance with intent to deliver within 1000 feet of a church, to be served concurrently with a five-year prison term for his conviction of aggravated unlawful possession of a weapon by a felon.

¶ 22 On October 6, 2016, defendant filed his notice of appeal, and on October 26, 2016, he filed an amended notice of appeal.

¶ 23                                       II. ANALYSIS
¶ 24                     A. Unlawful Possession of a Weapon by a Felon
¶ 25 Defendant urges this court to reverse his conviction of unlawful possession of a weapon by a felon, arguing that the collapsible metal baton he possessed does not constitute a "bludgeon" within the meaning of section 24-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/24-1(a)(1) (West 2014)). Defendant does not dispute that he was a convicted felon or that he possessed the baton at the time of his arrest. The State counters that the baton qualifies as a "bludgeon" within the meaning of the statute. We agree with the State.

¶ 26 We begin with the statute and the familiar rules of statutory construction. The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *People v. Giraud*, 2012 IL 113116, ¶ 6. The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. *Id.* When the statute contains undefined terms, we may employ a dictionary to ascertain the plain and ordinary meanings of those terms. *People v. Davison*, 233 Ill. 2d 30, 40 (2009). Further, we will assume that the undefined terms were intended to have their ordinary and popularly understood meanings, unless doing so would defeat the perceived legislative intent. *People v. Fink*, 91 Ill. 2d 237, 240 (1982). Where the language is clear and unambiguous, we will apply the statute without resort to further aids of statutory construction. *Id.* Additionally, we read and interpret the statute as a whole so that no part is rendered meaningless or superfluous. *People v. Lloyd*, 2013 IL 113510, ¶ 25. We may also consider the consequences of construing the statutory language one way rather than another, and in doing so, we presume that the legislature did not intend the statute to have absurd, inconvenient, or unjust consequences. *People v. Koen*, 2014 IL App (1st) 113082, ¶ 30. The construction of a statute is a question of law, which is reviewed *de novo*. *Davidson*, 233 Ill. 2d at 40.

¶ 27 Section 24-1.1 of the Code reads in pertinent part:

"Unlawful Use or Possession of Weapons by Felons ***

(a) It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2014).

¶ 28 Incorporated therein, section 24-1 of the Code reads in pertinent part:

"Unlawful Use of Weapons

(a) A person commits the offense of unlawful use of weapons when he knowingly:

   (1) Sells, manufactures, purchases, possesses or carries any bludgeon, black-jack, slung-shot, sand-club, sand-bag, metal knuckles or other knuckle weapon regardless of its composition, throwing star, or any knife, commonly referred to as a switchblade knife, which has a blade that opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife, or a ballistic knife, which is a device that propels a knifelike blade as a projectile by means of a coil spring, elastic material or compressed gas; or

   (2) Carries or possesses with intent to use the same unlawfully against another, a dagger, dirk, billy, dangerous knife, razor, stiletto, broken bottle or other piece of glass, stun gun or taser or any other dangerous or deadly weapon or instrument of like character[.]" *Id.* § 24-1(a)(1), (2).

¶ 29    The statute does not define the term "bludgeon," and courts have been reluctant to develop a broad definition of the term. *People v. Kohl*, 364 Ill. App. 3d 495, 502 (2006); accord *People v. Perry*, 397 Ill. App. 3d 358, 361-62 (2010). The supreme court has noted that "Webster's Third New International Dictionary 240 (1971) defined 'bludgeon' as 'a short stick used as a weapon usu[ally] having one thick, heavy or loaded end: billy.' " *Fink*, 91 Ill. 2d at 240. Black's Law Dictionary has defined "bludgeon" as " '[a] heavy club or stick used as a weapon, commonly weighted in one end by metal.' " *Perry*, 397 Ill. App. 3d at 361 (quoting Black's Law Dictionary 157 (5th ed. 1979)).

¶ 30    However, a bludgeon need not take the form of a club or a stick. *People v. Collins*, 6 Ill. App. 3d 616, 619 (1972). In *Collins*, the appellate court held that a heavy metal chain wrapped with tape satisfied the definition of a "bludgeon." *Id.* In *Perry*, the appellate court held that a reasonable jury could find that a padlock in a sock is a bludgeon. *Perry*, 397 Ill. App. 3d at 362. In both *Collins* and *Perry*, the courts reasoned that the items at issue had no legitimate use other than as a weapon. *Collins*, 6 Ill. App. 3d at 619; *Perry*, 397 Ill. App. 3d at 362.

¶ 31    Here, defendant repeatedly argues that he possessed merely a baton or a nightstick and that the fact that a baton can be club-like does not make it a bludgeon. But defendant ignores the actual nature of what he possessed; it was not merely club-like. Defendant possessed a metal baton, 8 inches long when collapsed, which would extend forcibly and instantly to 21 inches when the user flicked his wrist. Additionally, the baton was weighted and thicker at one end, and it weighed nearly one pound. It is clear from the definitions provided above and from the other weapons listed in section 24-1(a)(1) that defendant's collapsible metal baton was a "bludgeon" within the meaning of the statute.

¶ 32    In addition, the legislative intent of the unlawful-use-of-weapons statute (720 ILCS 5/24-1 (West 2014)) is to protect the police and the public from dangerous weapons. *People v. Pulley*, 345 Ill. App. 3d 916, 923-24 (2004). The legislative intent of the unlawful-use-or-possession-of-weapons-by-felons statute (720 ILCS 5/24-1.1 (West 2014)) is " 'to keep dangerous weapons, including but not limited to firearms, out of the hands of convicted felons in any situation whether it be in the privacy of their own home or in a public place.' " *People v. Nowells*, 2013 IL App (1st) 113209, ¶ 22 (quoting *People v. Kelly*, 347 Ill. App. 3d 163, 167 (2004)). Strictly construing the term "bludgeon" to exclude defendant's collapsible metal baton would be contrary to the purposes for which the statutes were enacted and lead to an absurd result. See *People v. Smith*, 2013 IL App (2d) 121164, ¶ 9; accord *People v. Trzeciak*, 2013 IL 114491, ¶ 40.

¶ 33        Defendant cites *People v. Fink*, 94 Ill. App. 3d 816 (1981), to support his argument. In *Fink*, this court held that a nightstick was not a bludgeon within the meaning of the statute at issue. *Id.* at 819. Our supreme court held that "nightstick" is within the broad definition of "bludgeon" but is also within the specific definition of "billy." *Fink*, 91 Ill. 2d at 240. The supreme court thus affirmed this court's dismissal of the complaint, because the State had not charged the defendant with possession of a nightstick or a billy with intent to use it unlawfully against another in violation of section 24-1(a)(2). *Id.* In contrast, defendant in this case did not possess a simple nightstick or billy; rather, he possessed a collapsible metal baton, weighted at one end and extendable with a flick of the wrist. The nightstick in *Fink* was not weighted and there was no indication that it was extendable with a flick of the wrist. See *Fink*, 94 Ill. App. 3d at 817. Further, a collapsible metal baton is not a specific type of billy. Accordingly, this case is distinguishable from *Fink*.

¶ 34                        B. Possession of a Controlled Substance With Intent to Deliver

¶ 35        Next, defendant argues that the State failed to prove beyond a reasonable doubt that he was guilty of possession of a controlled substance with intent to deliver. Defendant contends that there was no evidence of a transaction, the amount of cocaine was consistent with personal use, and there were no other factors to suggest that he intended to deliver it. Defendant, therefore, urges this court to reduce his conviction to simple possession of a controlled substance and remand the cause for resentencing.

¶ 36        In all criminal cases, when a defendant challenges the sufficiency of the evidence, the relevant question for the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Bush*, 214 Ill. 2d 318, 326 (2005) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution. *Id.* To convict a defendant of possession of a controlled substance with intent to deliver, the State must prove that the defendant (1) had knowledge of the presence of the narcotics, (2) had possession or control of the narcotics, and (3) intended to deliver the narcotics. 720 ILCS 570/401 (West 2014); *People v. Robinson*, 167 Ill. 2d 397, 407 (1995). Defendant does not dispute the first two elements.

¶ 37        "Because direct evidence of intent to deliver is rare, such intent must usually be proven by circumstantial evidence." *Robinson*, 167 Ill. 2d at 408. Accordingly, "this issue involves the examination of the nature and quantity of circumstantial evidence necessary to support an inference of intent to deliver." *Id.* In *Robinson*, our supreme court noted that numerous factors have been considered by Illinois courts as probative of a defendant's intent to deliver. *Id.* These factors include (1) whether the quantity of the controlled substance in the defendant's possession is too large to be viewed as being for personal consumption; (2) the high purity of the substance; (3) the possession of weapons; (4) the possession of large amounts of cash; (5) the possession of police scanners, beepers, or cellular telephones; (6) the possession of drug paraphernalia; and (7) the manner in which the substance is packaged. *Id.* However, *Robinson* clearly intended to merely provide examples of factors and to allow courts to consider others. *Id.* at 408-15; see *Bush*, 214 Ill. 2d at 324.

¶ 38        Defendant argues that, based on the circumstantial factors in *Robinson*, the State failed to prove beyond a reasonable doubt that he intended to deliver the cocaine. Specifically,

defendant argues that the 9.9 grams of cocaine found is entirely consistent with personal consumption. See *People v. Ellison*, 2013 IL App (1st) 101261, ¶ 15 (describing expert testimony on amounts of cocaine and finding 3.112 grams of cocaine to be consistent with personal use).

¶ 39 "The quantity of [a] controlled substance alone can be sufficient to prove an intent to deliver." *People v. Beverly*, 278 Ill. App. 3d 794, 799 (1996). However, "[w]hen the amount of substance seized is an amount that may be considered consistent with personal use, additional evidence of intent to deliver is required to support a conviction." *Id.*

¶ 40 Here, taking the evidence in the light most favorable to the State, we determine that the evidence is sufficient to sustain defendant's conviction. Upon searching defendant and the car he was driving, Wolek and Rapacz recovered a box of sandwich bags, a large sandwich bag containing 20 smaller corners of bags—each containing cocaine, weighing a total of 9.9 grams—and a collapsible baton, which we have determined is a weapon. Bisceglie, an expert on drug investigations, delivery, and possession with intent to deliver, opined that defendant intended to deliver. Bisceglie based his opinion on, *inter alia*, the weight of the cocaine, the way the cocaine was packaged, the lack of user paraphernalia, and the presence of a weapon. It is the responsibility of the trier of fact to weigh the evidence and to draw reasonable inferences from the facts, and this court will not substitute its judgment for that of the factfinder on questions involving the weight of the evidence. *People v. Bradford*, 2016 IL 118674, ¶ 12. We conclude that the evidence supports defendant's conviction of possession of a controlled substance with intent to deliver.

¶ 41 Defendant cites numerous cases to support his argument. However, whether the State has established intent to deliver is resolved on a case-by-case basis, and the fact that evidence in one case is not as strong as that in other cases is not controlling. *People v. Blan*, 392 Ill. App. 3d 453, 457 (2009).

¶ 42 Defendant argues that the amount of cocaine—9.9 grams—was consistent with personal use, citing numerous cases to support his argument. In *Ellison*, 2013 IL App (1st) 101261, ¶ 15, however, "there was no testimony that the amount of drugs recovered—3.112 grams of cocaine and approximately 0.4 grams of heroin—was inconsistent with personal use." In this case, Bisceglie testified that the amount of drugs and their value were inconsistent with personal use. In addition, defendant possessed a weapon, a factor not present in *Ellison*. Thus, *Ellison* is distinguishable from this case.

¶ 43 In *People v. Sherrod*, 394 Ill. App. 3d 863, 866 (2009), "[n]o testimony was presented indicating that 1.8 grams of cocaine 'could not reasonably be viewed as designed for personal consumption' " (quoting *People v. Little*, 322 Ill. App. 3d 607, 615 (2001)). Further, no expert testified regarding the packaging, cost, and typical personal use of controlled substances. *Id.* Here, Bisceglie testified regarding these issues, opining that the amount of drugs, the manner of packaging, the additional packaging, and the bludgeon were consistent with intent to deliver. Accordingly, *Sherrod* is distinguishable from this case.

¶ 44 III. CONCLUSION

¶ 45 For the reasons stated, we affirm the trial court's judgment.

¶ 46 Affirmed.