2020 IL App (2d) 180321-U
No. 2-18-0321
Order filed October 13, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15-CF-2564 |
| | ) | |
| | ) | |
| | ) | |
| CHRISTOPHER SMITH, | ) | Honorable |
| | ) | Ronald J. White, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Birkett and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1　*Held*:　The State failed to prove beyond a reasonable double that defendant was guilty of aggravated fleeing or eluding a police officer where no evidence was presented that the officers who attempted to stop defendant's vehicle were wearing police uniforms. Accordingly, we reversed that conviction. We also held that although the trial court did not strictly comply with Rule 605(a)'s admonishments to defendant after he was found guilty and sentenced for reckless homicide, defendant failed to prove that he was prejudiced and denied justice by that error.

¶ 2　Defendant Christopher Smith was convicted of reckless homicide (720 ILCS 5/9-3(a) (West 2014)) and aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-

204.1(a) (1), (2) (West 2014)). He was subsequently sentenced to concurrent prison terms of 10 years and 3 years, respectively. On appeal, defendant argues that his conviction for aggravated fleeing or attempting to elude a peace officer should be reversed where the State neglected to present evidence as to whether the officers pursuing him were in uniform. He also contends that we should remand this cause to allow him to file a motion to reconsider his sentence because the trial court's admonishments violated Illinois Supreme Court Rule 605(a). Ill. S. Ct. R. 605(a) (eff. Oct. 1, 2001). In the alternative, defendant requests that this court reduce his sentence for reckless homicide because: (1) it was based upon an improper factor in aggravation; or (2) he is medically disabled and has concerns about remaining in prison due to the COVID-19 pandemic. For the following reasons, we affirm in part and reverse in part.

¶ 3                                    I. BACKGROUND

¶ 4      At a bench trial in which defendant proceeded *pro se*, Rockford police officer Chris Popielarczyk testified that in the early morning hours of November 3, 2015, he was on duty on a "SCOPE" team. That team was a specialized unit made up of around 14 police officers that were split into two teams. Their job was to look for cars to stop for traffic violations and see if they could detect any further violations the law, for example, unlawful possession of guns or drugs. Popielarczyk and his partner Chris Jones were working in a black, unmarked squad car equipped with red and blue lights that were inside the front, back and sides of the car. The lights were able to be seen externally. Around 1:00 a.m., the officers were traveling westbound on Fairview approaching a stop sign at Oakley when they observed a silver Chevrolet Tahoe traveling eastbound toward them on Fairview. The Tahoe stopped at the stop sign and then continued eastbound on Fairview past the officers. Popielarczyk noticed that the Tahoe did not have a front

license plate. As the Tahoe passed them the officers noticed that the rear license plate was present but not properly illuminated.

¶ 5 Popielarczyk made a U-turn with the intention of stopping the Tahoe for the license plate violations. He followed the Tahoe, which turned south on Furman and west on School Street. When the Tahoe next turned on Central, Popielarczyk activated his lights. The Tahoe immediately accelerated and drove northbound on Central at a high rate of speed. He did not have a chance to activate his siren because as soon as he activated his red and blue lights the Tahoe took off. Popielarczyk estimated that the Tahoe reached a speed of 65 miles an hour and said that the speed limit in that area was 30 miles per hour. After the Tahoe sped away, he pulled over and briefly parked the squad car on the east side of Central, adhering to his department's no-chase policy for traffic violations.

¶ 6 Popielarczyk watched the Tahoe travel northbound on Central and drive through a red light at Auburn before he lost sight of the vehicle. He resumed driving north on Central to look for the vehicle and began circling the neighborhood. A few minutes later Popielarczyk and Jones received a dispatch call about a vehicle collision in the 2400 block of Central, just east of Kilburn. When he arrived at that location, officer William Donato directed he and Jones to a nearby wooded area where he saw a silver Tahoe flipped over on the hood of the vehicle. The license plate of the Tahoe was the same one that he had attempted to pull over a few minutes before. He then saw an Officer Castronovo walk up to the passenger said of the vehicle heard him say, "woah." He could not see what Castronovo was doing because there were many firefighters trying to extricate the men from the vehicle, but he saw Castronovo walk away from the vehicle with a firearm. Nine live rounds of ammunition were found in the firearm, which was a high point .40 caliber semi-automatic handgun.

¶ 7    Rockford police officer Chris Jones, Popielarczyk's partner, testified similarly to Popielarczyk's version of events surrounding the traffic stop. When asked whether the siren was activated at the time the red and blue lights were turned on, Jones said that he did not recall if the siren was activated because Popielarczyk was in charge of activating any emergency equipment in the squad car.

¶ 8    Rockford police officer Mark Castronovo testified that on November 3, 2015, he responded to a vehicle crash at the 2400 block of North Central in Rockford. Officer Donato directed him to a heavily wooded area where he saw the Tahoe flipped onto its roof. There were several police officers, firemen and paramedics at the scene. As he was clearing debris from the scene, a Lieutenant Schoonover with the Rockford Fire Department asked him to come toward the vehicle. He heard a fireman yell, "don't do it!". Schoonover told Castronovo that there was a gun in the vehicle. He saw the gun, which was on the passenger side of the wreckage. There were two men in the vehicle who were both within arm's reach of the handgun. Castronovo identified defendant as one of the men in the Tahoe.  The men were intertwined with each other and were suspended on the vehicle's roof. The gun's magazine was next to the weapon. Castronovo picked up the gun and the magazine and gave them to another officer.

¶ 9    On cross-examination Castronovo said that he could not be sure if defendant was reaching for the handgun when he was looking into the vehicle.

¶ 10    The forensic pathologist who performed the autopsy on the passenger, James Smith, testified that the victim likely died of traumatic asphyxia, the immediate cause of which was a motor vehicle accident.

¶ 11    The State presented accident reconstruction testimony that showed the Tahoe veered across oncoming traffic lanes into the woods and that at some point the Tahoe lost control. Information

from the Tahoe's airbag module showed that five seconds before the crash the vehicle was going 97 miles per hour and that the driver's foot was off the brake for eight full seconds before the crash. The speed limit near the scene of the accident was marked as 40 miles per hour.

¶ 12    Rockford police officer William Donato testified that he was the first to arrive at Kilburn and Central on November 3, 2015 around 1:00 a.m. He was flagged down by three women who were frantically waving their hands and pointing to the west. He shined his flashlights into the woods to the left. As he walked through the woods, he saw the outline of the flipped vehicle. As he approached the Tahoe, he heard a man say, "get off me, get off me, open the door." When the men were finally extricated from the vehicle defendant was placed on a stretcher. Since a handgun was found on the scene Donato searched defendant. He found no contraband, but defendant's cell phone fell out of his pocket while Donato was searching him. Donato put the cell phone in his pocket and forgot to give it back to defendant.

¶ 13    Around 2:50 a.m. that morning Donato went to Rockford Memorial Hospital (hospital) to put defendant's cell phone into his property bag. He went to the emergency room and saw Officer Trout asking defendant if he wanted to speak to him or not. Defendant appeared agitated and kept asking Trout if his "cousin" was dead.[1] He also kept saying that the police and fire department were to blame. As Donato was placing defendant's cell phone in the property bag defendant told Donato that he wanted to talk to him. Defendant then told Donato that he fled the police because the victim had his girlfriend's handgun with him, and the victim had an outstanding warrant for his arrest in Ogle County.

---

[1] The victim's name was James Smith, but he was not related to defendant, despite defendant referring to James as his cousin.

¶ 14    Rockford police officer Robert Trout testified that he was a traffic investigator for the department. On November 3, 2015, he was sent to the crash scene around 1:00 a.m. He saw the Tahoe flipped over and defendant and the victim in the Tahoe. The victim appeared to be dead. When Trout left the scene, he ran LEADS on defendant and learned that he had a revoked driver's license and outstanding warrants for his arrest in Rockford.

¶ 15    Trout got to the hospital around 2:00 a.m. and hospital staff told him that defendant was in trauma room one. When he entered the room, defendant appeared very angry and began yelling obscenities at him. Trout read defendant his *Miranda* rights and defendant agreed to speak to Trout. Defendant told Trout that he did not stop when the police tried to stop him because "he had a warrant." He also said he did not stop because "the police weren't shit." Defendant told Trout that he had a half pound of drugs in his car at one time, and that he had "beat" a murder charge in the past.

¶ 16    Trout said that he did not observe signs of impairment when he saw defendant at 2:00 a.m. on the morning of the accident.  However, when he escorted defendant on an elevator at 4:00 a.m., defendant was about two to three feet away from him and he could smell alcohol on his breath. At that point defendant told him that he had consumed a pint of Remy. Blood and urine samples were obtained from defendant shortly after 7:00 a.m. Toxicology results revealed that defendant had .078 grams per deciliter of ethanol alcohol in his system. A urine screening was positive for metabolites of THC and cocaine.

¶ 17    At the conclusion of the bench trial the court found defendant guilty of reckless homicide (720 ILCS 5/9-3(a) (West 2014)) and aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a) (West 2014)). The presentence investigation report (PSI) indicated that defendant's mother gave birth to him at 16 years of age and struggled with substance abuse. His

father was shot and killed when defendant was nine years' old. He was primarily raised by his grandmother, who was reported to physically beat defendant as a form of corporal punishment. Defendant had previously obtained his GED while incarcerated.

¶ 18     The PSI indicated that defendant had an extensive criminal history. Excluding many traffic violations, defendant had convictions for second degree murder; burglary (2 convictions); unlawful use of weapons (2 convictions); illegal possession of a firearm (2 convictions); criminal trespass to a vehicle; criminal trespass to a residence; possession of a stolen vehicle; an unnamed violation of the Illinois Controlled Substances Act; manufacture and delivery of cocaine; manufacture and delivery of cannabis; and resisting a peace officer. The court did not consider an unrelated aggravating fleeing or eluding a police officer in defendant's background because the disposition was unclear. Defendant had been sentenced to the Illinois Department of Corrections previously.

¶ 19     At the sentencing hearing defendant testified that his conviction for second degree murder stemmed from an incident when someone tried to rob him, where he defended himself when he "upped the pistol" on the robber.

¶ 20     Police officer Richard Gambini testified in aggravation to the circumstances surrounding defendant's 2007 conviction for manufacture or delivery of cocaine, which arose when a no-knock search warrant was executed at defendant's home. Gambini entered defendant's residence and saw him on an air mattress with his current wife. Several small children under the age of 12 were also in the home. Gambini saw defendant take something out of his pants and put it on the floor. When Gambini got closer he recognized the substance in the bag as crack cocaine, so he grabbed defendant's arm and told him to lie on the floor and that he was under arrest. Defendant said, "fuck you; I just had my lung removed" and that he could not roll onto his stomach. Defendant had no

shirt on at the time and Gambini noticed no surgical stitches or anything that would indicate defendant had had surgery on his chest. Ultimately 57 bags of crack cocaine were found in defendant's residence.

¶ 21    On cross-examination Gambini acknowledged that it was in his police report that he slapped defendant one time in the side of the head, but he denied doing so repeatedly. Defendant asked Gambini if he had noticed the scar on his chest from recent open-heart surgery and he said no, but that he did see the scar at trial.

¶ 22    In his remarks to the court, defendant acknowledged that he was caught with drugs stemming from the 2007 conviction and that it was not the right choice, but he could not get a job and that was the only way that he knew to make money for his family. He regretted having his wife and children around the drugs and he said that he lost those relationships because of the choices he had made.

¶ 23    At the time of the instant offense defendant's bond had been revoked in his 2014 manufacture or delivery of cannabis case, 14-CF-1947, and there was an outstanding warrant for his failure to appear in that case. The State argued that any sentence in this case would be required to run consecutively to the four-year sentence that he ultimately received in 14-CF-1947, since defendant was on pre-trial release when the crash occurred.  Defendant disputed the State's calculations about his amount of custody credit.

¶ 24    Defendant also expressed remorse at killing his best friend. He said that he did not intend for that to happen. The victim told him that he had his girlfriend's gun with him in the truck and he did not want to go to jail, so he asked defendant to flee the scene. Defendant was trying to protect his best friend.

¶ 25    The trial court first noted that defendant could receive the minimum sentence of two years' imprisonment or the maximum ten years' imprisonment on the reckless homicide conviction. That sentence would be served concurrently with the possible sentence of one to six years' imprisonment on the aggravated fleeing of a peace officer conviction, and the concurrent sentences would be served consecutively to the four year sentence for defendant's conviction of the manufacture and delivery of cannabis case in 14-CF-1947.

¶ 26    The trial court said that defendant was a relatively young man at 41 years of age. He had some health problems and no real substantial history of employment. He had two children ages 21 and 11. He had a continued history of alcohol and drug abuse. The court said it had read the PSI and acknowledged defendant's difficult childhood but noted that some people learn from those experiences and defendant had not. The court noted that defendant's extensive criminal history went back to 1994. It referred to defendant's successful completion of an impact incarceration program in 1996 after being sentenced to 8 years' imprisonment on a violation of the Illinois Controlled Substances Act (720 ILCS 570/401 (West 1996)) and remarked that it was rare for someone to reoffend after completing that program. The court said that it had sentenced young people to the impact incarceration program because it believed that only two people it had sentenced to that program had reoffended. However, successful completion of the impact incarceration program did not stop defendant because he continued to re-offend. The court then continued to detail defendant's many prior criminal convictions.

¶ 27    Defendant interjected and said that his conviction for the violation of the Illinois Controlled Substances Act was listed on the PSI as a class 1 felony, but that he had a certificate of conviction that listed it only as a class 4 felony, so he should not have been sentenced to eight years on that conviction. The court responded that the important factor with that conviction was that defendant

participated in the impact incarceration program, which was like being in the military. It said, "[w]hen you come back from that program and have some direction, have some self-esteem, you have some courage to go forward and make your life better, but it didn't happen." The court continued detailing defendant's convictions, including a six-year sentence of incarceration for the manufacture and delivery of cocaine that defendant received in 2007. Then in 14-CF-1947 defendant was sentenced to four years' imprisonment for the manufacture and delivery of cannabis. While defendant was out on bond on that case he was charged with the instant offenses. The court said:

> "You have an extensive, extensive criminal history, and you're only 42—41 years of age. When I look at page 7 (of the PSI)—and it's clear because you continue to pick up criminal offenses—your performance while on probation—because probation is something that is given to a person to assist them –on page 7, first paragraph, records indicate that you're not compliant with probation when you're given 24 months' probation for the criminal trespass to vehicle in 94-CF-1630.

> Then, we have 1995. You were sentenced to 30 months' probation for the offense of possession of a stolen motor vehicle. Defendant was not compliant with probation.

> These are choices that you made, Christopher."

¶ 28    In conclusion, the court said that it believed the sentence it was imposing was necessary to deter others form committing the same offenses. The court then ordered that a 3-year sentence be imposed for aggravated fleeing and eluding a peace officer, to be served concurrently with a 10-year sentence for reckless homicide. Those sentences were to be served consecutively to the four-year sentence of imprisonment in 14-CF-1947.

¶ 29    The court then admonished defendant about his right to appeal. It noted that defendant had represented himself at trial but that he was also provided standby counsel with whom the court suggested defendant confer. Standby counsel could explain the procedure to defendant if he wished to appeal the convictions or sentences in this case. Defendant had the right to appeal its guilty findings during the bench trial and the subsequent sentences imposed. Defendant had the right to ask the clerk of the court to file a notice of appeal on his behalf. If defendant wanted to challenge the sentences imposed, he must file, prior to an appeal, a motion to reconsider his sentences. Then the court would have a hearing on the motion to reconsider. If it granted defendant's motion the court would resentence him. If it denied the motion defendant could then appeal.

¶ 30    The court said that since defendant was indigent, a copy of the trial transcript would be provided to him without cost and an attorney would be appointed to assist defendant in his appeal or his motion to reconsider the sentences. It continued:

"[a] notice of appeal or motion to reconsider the sentence must be filed within 30 days of today's date. Today is the 26th of April. If that notice of appeal or motion to reconsider is not filed within 30 days of today's date, you will lose the right to appeal and challenge your sentence

If the motion to reconsider sentence is denied and you still desire to appeal, you must request the clerk to file a notice of appeal within 30 days of the date that the motion to reconsider was denied."

¶ 31    The court asked defendant if he had any questions and the following colloquy occurred:

DEFENDANT: So, I can put a postconviction in on the sentencing though, right?"

COURT: Pardon me?

DEFENDANT: I can put a postconviction in on the sentencing, though, right?

COURT: Yeah. You can file a notice of—file a motion to reconsider.

DEFENDANT: So, I wouldn't have to do the motion to reconsider because it's just—it's just on the time—on the time frame for the credit.

COURT: Well, I'm going to do this. I'm not going to tell you what to do and how to do it. I can't do that—because you represent yourself.

I am going to stay the mittimus here just for a few days here until maybe next week. And if you want to confer with [standby counsel] on what you want to do—Do you want to do something today? Do you want to file a notice of appeal?

DEFENDANT: Yes, file a notice of appeal.

COURT: Okay. Well, let's have you confer with [standby counsel] just for a moment.

DEFENDANT: I don't want to talk to him—I don't even feel comfortable talking to him.

COURT: Why don't you prepare a written motion to appeal, all right?

DEFENDANT: Yes, sir.

COURT: I'll give you a moment.

DEFENDANT: I don't need—I don't need any—I don't need any time for stay or nothing. I can finish it down there.

COURT: That's all right. Why don't you take a moment here that you're filing a notice of appeal. Just put the case number that "I hereby appeal"—well, you write what you wish—do you want an attorney to represent you on appeal?

DEFENDANT: Yes, sir.

COURT: I'll appoint an attorney to represent [defendant] on appeal."

¶ 32    Defendant began to argue with the court about the amount of custody credit he was receiving. The court said it would not entertain additional argument and that defendant needed to address his concerns with his appellate counsel. Defendant continuously talked over the court until he was finally removed from the courtroom for being disruptive.

¶ 33    On April 26, 2018, defendant filed a *pro se* notice of appeal.  He did not file a motion to reconsider his sentence. On May 7, 2018, the Office of the State Appellate Defender filed an amended notice of appeal.

¶ 34    On July 9, 2018, defendant filed a motion to amend the mittimus in the instant case and in 14-CF-1947 seeking to correct scrivener's errors in the date ranges for custody credit. An amended judgment in the case was entered on August 3, 2018, *nunc pro tunc* to April 26, 2018, showing 512 days of credit in this case from November 30, 2016, through but not including April 26, 2018.

¶ 35                                    II. ANALYSIS

¶ 36    On appeal, defendant argues that his conviction for aggravated fleeing or attempting to elude a peace officer should be reversed where the State neglected to present evidence as to whether the officers pursuing him were in uniform. He also contends that we should remand this cause to allow him to file a motion to reconsider his sentence because the trial court's admonishments violated Illinois Supreme Court Rule 605(a). Ill. S. Ct. R. 605(b) (eff. Oct. 1, 2001). In the alternative, defendant requests that this court reduce his sentence for reckless homicide because: (1) it was based upon an improper factor in aggravation; or (2) he is medically disabled and has concerns about remaining in prison due to the COVID-19 pandemic. We will address each issue in turn.

¶ 37                          A. Police Uniform Requirement

¶ 38     Defendant first argues that his conviction for aggravated fleeing or attempting to elude a peace officer should be reversed where the State neglected to present evidence as to whether the officers pursuing him were in uniform, which he alleges is an essential element of the statute under which he was convicted.  In support of this claim defendant cites to *People v. Maxey*, 2018 IL App (1st) 130698-B, ¶¶ 117-122, *People v. Williams*, 2015 IL App (1st) 133582, ¶¶ 8-20 and *People v. Murdock*, 321 Ill. App. 3d 175, 176 (2001).

¶ 39     In response, the State contends that the statute in question includes the requirement that a police officer be in uniform "because it ensures that the defendant is fleeing or eluding an actual police officer," citing to this court's recent opinion in *People v. Cavitt*, 2019 IL App (2d) 170149, ¶ 181, *appeal pending*, (Jan. 1, 2020). The State argues that where there is no question a defendant is aware it is a police vehicle attempting to affect a traffic stop, the uniform requirement is not an element of the offense.

 ¶ 40     In challenging the sufficiency of the evidence in a criminal case, a reviewing court will not substitute its judgment for that of the trier of fact and will not reverse a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.* ¶ 173 (citing *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001)). A reviewing court draws all reasonable inferences in favor of the State (*People v. Davison*, 233 Ill. 2d 30, 43 (2009)) and will not reverse a conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)).

¶ 41     In resolving an issue of statutory construction, the court's objective involves ascertaining and carrying out the "true intent and meaning of the legislature evidenced by the language used." *Cavitt*, 2019 IL App (2d) 170149, ¶ 174 (quoting *Langendorf v. City of Urbana*, 197 Ill. 2d 100,

109 (2001)). Indeed, our inquiry "always begin[s] with the language of the statute, which is the surest and most reliable indicator of legislative intent." *People v. Pullen*, 192 Ill. 2d 36, 42 (2000). We give undefined statutory words and phrases their natural and ordinary meanings. *Id*. We also enforce the clear and unambiguous language as written, without resort to other aids of construction, *e.g.*, legislative history. *Cavitt*, 2019 IL App (2d) 170149, ¶ 174 (citing *People v. Fitzpatrick*, 158 Ill. 2d 360, 364-65 (1994)). The construction of a statute is a question of law, which we review *de novo*. *People v. Starks*, 2019 IL App (2d) 160871, ¶ 26.

¶ 42    Illinois law provides that a defendant, while operating a motor vehicle, commits fleeing or attempting to elude if, among other things, he willfully fails or refuses to bring his vehicle to a stop when a peace officer gives a visual or audible signal to do so. 625 ILCS 5/11-204(a) (West 2014). "The signal given by the peace officer may be by hand, voice, siren, red or blue light. Provided, the officer giving such signal *shall be in police uniform*, and, if driving a vehicle, such vehicle shall display illuminated oscillating, rotating or flashing red or blue lights *which when used in conjunction with an audible horn or siren* would indicate the vehicle to be an official police vehicle." (emphasis added) 625 ILCS 5/11-204(a) (West 2014).   The offense is aggravated if, among other things, the defendant drove at least 21 m.p.h. over the speed limit or caused bodily injury to an individual. 625 ILCS 5/11- 204.1(a)(1), (2) (West 2014).

¶ 43    Several districts of this court, including our own, have looked at the plain language of the statute at issue and held that in order to convict a defendant for fleeing or eluding a peace officer the State must prove that the officer was wearing a police uniform. See *People v. Maxey*, 2018 IL App (1st) 130698-B, ¶¶ 120-21 (reversing conviction where evidence did not show what the officers were wearing at the time of the stop); *People v. Williams*, 2015 IL App (1st) 133582, ¶¶ 14, 16 (because statute requires pursuing officer be in police uniform, reversing conviction where

officer testified that he wore " ' civilian dress' " and noting operative concern "is not whether [the defendant] knew the police were following him; but rather, whether the requirements of the statute have been met"); *People v. Murdock*, 321 Ill. App. 3d 175, 176 (2001) (conviction reversed where no evidence was presented concerning the officer's clothing and court rejected the State's argument that the defendant should have known the pursuer was a police officer because the lights and siren were activated).

¶ 44    We initially note that we reject the State's contention that our decision in *Cavitt* excused the State from proving an essential element of the offense, that the peace officer in question was wearing a police uniform. Although the *Cavitt* court noted that the purpose of the uniform requirement was that it ensured that a defendant was fleeing or eluding an actual police officer (*Cavitt*, 2019 IL App (2d) 170149, ¶ 181, *appeal pending*, (Jan. 1, 2020)), the issue of whether a conviction for aggravated fleeing or eluding a peace officer could be upheld *with no evidence* that the peace officer was wearing a police uniform was not before the *Cavitt* court. Instead, we upheld the defendant's conviction for aggravated fleeing and eluding a peace officer in *Cavitt* when a non-undercover police officer, who ordered the defendant to stop his car and who was in the defendant's range of vision, was wearing a black tactical vest with police markings and a police badge around his neck. *Id.* ¶ 177. We concluded that a vest with police markings can, under certain circumstances, constitute a police uniform under the statute and that the totality of the evidence in that case was sufficient to establish the uniform element of the offense. *Id.* ¶ 181. Such is not the case here.

¶ 45    We agree with defendant that *Maxey*, *Williams*, and *Murdock* make it clear that the plain language of the statute requires that a peace officer be in police uniform to convict a defendant of this offense. At trial, no evidence was presented that Officers Popielarczyk or Jones were in police

uniforms when they attempted to stop defendant for a traffic violation. Accordingly, the State failed to prove an essential element of this offense. For this reason, we reverse defendant's conviction for aggravated fleeing or eluding a police officer.

¶ 46               B. Illinois Supreme Court Rule 605(a) Admonishments

¶ 47     Defendant next argues that this case should be remanded to allow him to file a motion to reconsider his sentence where the trial court's misleading Rule 605(a) admonishments prejudiced him and denied him real justice. Defendant specifically refers to violations of Rule 605(a)(3)(B) and (a)(3)(C). Ill. S. Ct. R. 605(a)(3)(B), (C) (eff. Oct. 1, 2001). He contends that the trial court's admonishments left out key information and affirmatively misled him by suggesting that a notice of appeal was sufficient to preserve any issues for appellate review. In the alternative, defendant requests that this court reduce his sentence for reckless homicide because it was based upon an improper factor in aggravation.

¶ 48     Rule 605(a) provides that, at the time of imposing sentence, the trial court must advise the defendant that "prior to taking an appeal, if the defendant seeks to challenge the correctness of the sentence, or any aspect of the sentencing hearing, the defendant must file in the trial court within 30 days of the date on which sentence is imposed a written motion asking to have the trial court reconsider the sentence imposed, or consider any challenges to the sentencing hearing, setting forth in the motion all issues or claims of error regarding the sentence imposed or the sentencing hearing[.]" Ill. S. Ct. R. 605(a)(3)(B) (eff. Oct. 1, 2001). Rule 605(a) also requires the court to admonish the defendant "that any issue or claim of error regarding the sentence imposed or any aspect of the sentencing hearing not raised in the written motion shall be deemed waived." Ill. S. Ct. R. 605(a)(3)(C) (eff. Oct. 1, 2001). A trial court's compliance with the requirement of a supreme court rule is reviewed *de novo*. *People v. Polk*, 349 Ill. App. 3d 760, 764 (2004).

¶ 49    Here, although the trial court properly informed defendant that he must file a motion to reconsider his sentence before he filed a notice of appeal, it did not inform him that any issue regarding the sentence not raised in that motion would be waived on appeal. Further, when defendant asked the court for clarification, the trial court's comments that defendant could file an appeal that day may reasonably have confused defendant as to the requirement about first filing a motion to reconsider if he sought to challenge the correctness of his sentence.  However, where a defendant is given inadequate Rule 605(a) admonishments regarding the preservation of sentencing issues for appeal, remand is required only where there has been prejudice or a denial of real justice because of the inadequate admonishment. *People v. Henderson*, 217 Ill. 2d 449, 466 (2005).

¶ 50    As support for his claim that he suffered prejudice and was denied real justice, defendant argues that he was given the maximum sentence for reckless homicide, 10 years' imprisonment. See 720 ILCS 5/9-3(d)(2) (West 2014); 730 ILCS 5/5-4.5-40(a) (West 2014). Defendant concedes that although his criminal history "no doubt played a role in the court's decision to impose a severe sentence," the court's comments show it was particularly moved by the fact that he continued to reoffend after successfully completing the impact incarceration program. Defendant claims that the court erroneously relied on extrinsic evidence, *i.e.*, its own purported familiarity with low rates of reoffending after the impact incarceration program, "and used that private knowledge or belief to infer that [defendant's] rehabilitative potential was exceptionally low." Defendant claims that the court's comments about the impact incarceration program at sentencing constituted an improper factor in aggravation and warrants a remand for him to file a motion to reconsider his sentence.  As support for this contention he cites to *People v. Dameron*, 196 Ill. 2d 156 (2001).

¶ 51     We are not persuaded. At the sentencing hearing in *Dameron* the trial court made lengthy references to a different case that had been presided over by the trial court's father when he was a judge many years before; the court also referenced a social science book at sentencing. *Id*. at 166-179. In contrast, the court's comments here about the impact incarceration program at defendant's sentencing hearing were a small part of its overall remarks about defendant's extensive criminal history. The court's remarks about the recidivism rates of prisoners who have completed that program, although admittedly incorrect, were given in a lengthy pronouncement of the court's sentencing decision. When the court made the references to the impact incarceration program it was explaining that defendant was not a candidate for probation because he had had numerous chances at probation, as well as a sentence to impact incarceration, over the years but had continued to re-offend. The court did not have to "infer" that defendant's rehabilitative potential was exceptionally low—his criminal history was proof of his lack of rehabilitative potential. A prime example of his lack of such potential was that at the time defendant committed the instant offenses, his bond had been revoked in 14-CF-1947 and there was an outstanding warrant for his failure to appear in that case. Ultimately, the trial court sentenced defendant to the maximum term of imprisonment for reckless homicide because the court found it was necessary to deter others from defendant's behavior and that defendant had a lengthy criminal history dating back to 1994. For all these reasons, we find that defendant has failed to demonstrate that he suffered prejudice or a denial of real justice when the trial court did not strictly comply with Rule 605(a)'s admonishments after the sentencing hearing. Ill. S. Ct. R. 605(a)(3)(B), (C) (West 2014). We also reject defendant's alternative request to reduce his sentence on his reckless homicide conviction for the same reasons.

¶ 52     Finally, in his reply brief defendant posits an additional reason why this court should reduce his sentence for reckless homicide. He notes that since his opening brief was filed, the Illinois

Department of Corrections (IDOC) has been greatly affected by the COVID-19 pandemic. He notes that he is medically disabled due to sleep apnea, high blood pressure and morbid obesity, which put him at extreme risk for infection and serious complications if he were to contract COVID-19. He acknowledges that Governor Pritzker has issued an executive order providing the IDOC with greater flexibility to furlough inmates in light of the COVID-19 pandemic, however, he argues that "the judiciary should not hesitate to do everything in its power to alleviate the burden on correctional institutions" and therefore this court should reduce his sentence to time served. Having found that defendant was properly sentenced to 10 years' imprisonment for reckless homicide, we will leave it to the IDOC to best determine how defendant should serve that sentence.

¶ 53                                  III. CONCLUSION

¶ 54     In sum, the State failed to prove that defendant was guilty of aggravated fleeing or eluding a police officer beyond a reasonable doubt when it presented no evidence of an essential element of the offense, that Popielarczyk and Jones were wearing police uniforms at the time they attempted to stop defendant for a traffic violation. Therefore, that conviction was reversed. Also, although the trial court did not strictly comply with Rule 605(a)'s admonishments to defendant after he was found guilty and sentenced, defendant failed to prove that he was prejudiced and denied justice by that error. The record overwhelmingly supported defendant's maximum sentence of 10 years' imprisonment for reckless homicide based upon his extensive criminal history dating back over 25 years. Finally, we declined defendant's invitation to reduce his sentence for reckless homicide to time served based upon his concern about contracting COVID-19 in prison.

¶ 55     Accordingly, the judgment of the circuit court of Winnebago County is affirmed in part and reversed in part.

¶ 56     Affirmed in part; reversed in part.