2021 IL App (2d) 190506-U
No. 2-19-0506
Order filed August 30, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-307 |
| MICHELLE R. DAWES, | ) ) ) | Honorable C. Robert Tobin III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's convictions and sentence. Defendant acquiesced to the trial court's evidentiary ruling that permitted the State to elicit testimony from its expert witness regarding a text message received by defendant and, therefore, cannot challenge the ruling on appeal. Defendant has not established she was prejudiced by defense counsel's failure to preserve for appeal a challenge to her sentence, and, therefore, her ineffective-assistance claim fails.

¶ 2   A jury found defendant, Michelle R. Dawes, guilty of possession with intent to deliver between 100 and 400 grams of cocaine (720 ILCS 570/401(a)(2)(B) (West 2016)) and simple possession of between 100 and 400 grams of cocaine (*id.* § 402(a)(2)(B)). The trial court merged the simple possession conviction into the possession-with-intent-to-deliver conviction and

sentenced defendant to 16 years' imprisonment. Defendant appeals, arguing (1) the trial court erred when it permitted, on the basis that the State's expert witness relied in part on the message to form his opinion, the witness to publish the contents of a text message defendant received after her arrest; and (2) defense counsel rendered ineffective assistance when he failed to move to reconsider defendant's sentence, thus forfeiting any challenge to her sentence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Charges

¶ 5    On November 14, 2016, Illinois State Police Trooper Greg Melzer observed a Nissan Maxima in which defendant was a passenger traveling west on Interstate 90 in Boone County. After determining the Maxima was speeding and observing the Maxima commit a lane violation at a toll booth, Melzer stopped the vehicle. Shortly after the stop, Trooper Alan Taylor arrived on scene, and, at the direction of Melzer, Taylor conducted a free-air sniff of the Maxima with his drug-detection dog, Bart. Bart alerted to the presence of narcotics within the vehicle and, during a subsequent search, the officers recovered 195.1 grams of a substance containing cocaine from beneath the center console. In addition, the officers searched defendant's purse and found, among other things, $1225 in cash, consisting mostly of $20 bills. The officers arrested defendant and the driver, Randy Greenhill. As defendant spoke with the police, she received a text message from a person named "Daniel," which stated, "But after this buy, I need a break. Seriously I'm the biggest dumbass in the world. LOL."

¶ 6    A grand jury subsequently indicted defendant on one count of possession with intent to deliver and one count of simple possession of the 195.1 grams of cocaine.

¶ 7                                    B. Pretrial Proceedings

¶ 8 Before trial, the State informed defendant it did not intend to introduce evidence, via testimony or exhibit, relating to the text message. However, the State subsequently moved *in limine* for the court to allow Detective Scott Bowers to testify as an expert in the field of narcotics without first having to disclose a written report or account of his expected testimony. At the hearing on the motion, the State told the court it intended to introduce the contents of the text message through Detective Bowers on the basis that Bowers considered the text message in forming his opinion that defendant possessed the cocaine with intent to deliver it. Defendant responded the text message should be excluded because it was "blatant hearsay," there was no "technical information from the source," such as "when it was sent, who sent it, *** and those types of things," the declarant was not available for cross-examination, and the message was vague. The State responded that expert witnesses "rely on hearsay all the time in rendering their opinions," and it did not "believe this would be any more consistent [*sic*] than independent experts reading other doctors' reports in all kinds of death cases and whatnot and using that to draw conclusions." The court granted the State's motion. As to the text message, the court found it was reasonable to infer that, based on the circumstances of the case, the text message was "was [from] one of the people that was going to ultimately purchase from her." Thus, it determined it would allow Bowers to publish the content of the text message on the basis that he considered it in reaching his expert opinion.

¶ 9                                  C. First Trial

¶ 10 On August 29, 2018, defendant's first trial commenced, and the State presented the testimony of several witnesses, including Trooper Melzer and Detective Bowers. During trial, before Melzer and Bowers testified, defendant sought clarification of the court's basis for permitting the State to publish the contents of the text message. The State told the court it would lay the foundation for the photograph of the text message through Melzer, while Bowers would

testify to its content on the basis that he considered it in rendering his expert opinion. Defendant asserted the text should not be considered by the jury "as far as [its] content, only for a limited purpose," and, accordingly, requested a limiting instruction be read before Bowers published the content of the text message. On that issue, the following exchange occurred between the parties and the court:

"[Defense counsel]: Well, if the State's expert is using a text message to show intent to deliver, that's a factor—the rule is an expert can consider anything whether it's admissible or not, whether it comes into evidence, whether it doesn't. You know, anything at all in the universe, and so I would say that to the extent this expert is considering the text message, the jury should be informed that that's the limited purpose for which it's being received on the issue of whether or not there was intent—you know, intent to deliver. Not for the truth of the matter. Otherwise, Your Honor, it's rank hearsay. Whether there's a foundation laid or not, it's complete hearsay. ***.

[The State]: I mean, what instruction does counsel have proposed that Your Honor would give to the jury?

[Defense counsel]: *** It's pretty much out of IPI modified. The very first instruction says *** evidence limited [*sic*] for a limited purpose should be considered only by you for that limited purpose.

THE COURT: *** The text message—there's no suggestion that the text message coming in had to do with that particular transaction. It may or may not have, but I don't think there's enough there—I don't think that's where the State is going. Instead, I think it's only whether or not she—

***

- 4 -

Whether she's a dealer and if she's got people—whether it's [*sic*] going to buy this product or a different product coming in, I think that's relevant for purposes of whether or not she had—you know, whether there was knowledge of the drugs, and if there is possession, whether or not it was with intent to distribute.

[Defense counsel]: *I agree, Your Honor, that [Bowers] can identify that as something he considered. \*\*\* He can say that and that's fair game. What I'm suggesting is—what I'm suggesting is the jury should be instructed in language similar to this, anything that Your Honor feels comfortable with, that this is being admitted for the purpose of this witness's reliance on this information, this text message, to form an opinion, but it should not be considered as being the truth of the matter asserted.*

[The State]: I would ask that the instruction be given.

\*\*\*

THE COURT: And again, ultimately [Bowers is] using that as an idea that *this is something that typically a drug dealer would have is requests to purchase coming in on their phones.*

[Defense counsel]: *Right. But it's hearsay.*

THE COURT: Yeah. But again, like you said, if he's—under [Illinois Rule of Evidence] 704, he can—I think it's [Rule] 704 that he can base his opinion on.

[Defense counsel]: *I'm not challenging it on that basis, Your Honor.*

THE COURT: Right. I think you even indicated that.

[Defense counsel]: I'm saying I've researched this. An expert can rely on something that happened on the moon yesterday.

THE COURT: Sure, sure.

[Defense counsel]: Experts do this routinely." (Emphases added.)

The parties and court agreed a limiting instruction would be read before Bowers testified to the content of the message.

¶ 11    Before Bowers published the contents of the text message, the court instructed the jury it could "consider [the contents of the text message] only for the purpose of being a basis for the opinion expressed by Detective Bowers. You may not consider this evidence as proof of the truth or matter [*sic*] printed in that text message." After the close of evidence, the court again instructed the jury that any evidence that had been received for a limited purpose could not be considered for any other purpose.

¶ 12    During the deliberations, the jury twice sent notes to the court stating they were deadlocked. The second note stated the deliberations "ha[d] turned very heated." The court and parties discussed how to proceed, and by agreement, the court declared a mistrial.

¶ 13                              D. Second Trial

¶ 14    Defendant's second trial commenced on April 23, 2019. That day, the court, with the parties' agreement, noted its prior rulings on the motions *in limine* and on the admissibility of evidence would remain in effect.

¶ 15                          1. *The State's Evidence*

¶ 16    Trooper Melzer testified that, on November 14, 2016, he stopped Greenhill and defendant on the right shoulder of westbound Interstate 90. Melzer approached the passenger side of the Maxima and made contact with them. Through the open passenger-side window, Melzer smelled an "overwhelming" odor of a "masking agent" and saw three cell phones inside. Greenhill tendered Melzer his Minnesota identification card, and defendant tendered her Minnesota driver's license. Melzer asked for the vehicle's registration, but Greenhill and defendant were not able to produce

it; instead, they tendered to Melzer a copy of the Maxima's title, which showed neither Greenhill nor defendant held title to it. Melzer found the name of the Maxima's registered owner after searching a database, and the name he found did not match the name on the title. Melzer asked defendant and Greenhill where they were going and whose vehicle it was, and they "simultaneously" said they had borrowed the Maxima from a friend. Defendant told Melzer they had visited Greenhill's sister, who was also her friend.

¶ 17    Troopers Taylor and Colon arrived on scene separately, and Melzer asked Taylor to conduct with Bart a free-air sniff of the Maxima. Bart positively alerted to the odor of narcotics in the vehicle. Melzer and Taylor searched the vehicle and recovered the cocaine, which was "one solid brick" packaged in a vacuum-sealed plastic bag and had been secreted in a plastic grocery bag beneath the lining of the center console.

¶ 18    The officers arrested defendant and Greenhill and transported them to the Illinois State Police office at Plaza 5 on Interstate 90. Melzer searched defendant's purse and recovered $1225 in cash, which consisted of 50 $20 bills, 2 $100 bills, and miscellaneous smaller bills, and a receipt. (The receipt was admitted into evidence at both trials, but no image of it appears in the record on appeal. During the first trial, defendant testified she made the purchase memorialized by the receipt and acknowledged the receipt showed the purchase was made in Minnesota at 5:19 p.m. on Saturday, November 12, 2016.) Melzer and Special Agent Tyrone Moore spoke with defendant and Greenhill. Defendant waived her *Miranda* rights and gave a written statement, denying she had knowledge of the cocaine. While she wrote her statement, Melzer asked her questions. Defendant told Melzer she arrived in Chicago from Minnesota on Friday (November 11) and visited a friend, whose name she did not provide. Melzer asked where the friend lived, and defendant told Melzer she did not know. Additionally, defendant did not respond to Melzer's

questions regarding what she had done on Saturday, Sunday, and Monday (the day she was stopped). Melzer also asked defendant about the cash he recovered. Defendant told Melzer the cash was for her rent, which she intended to tender to her landlord when she arrived back in Minnesota, and she withdrew the money on the Friday before the stop. Melzer asked defendant if she got it from a "bank teller or an ATM," and defendant told him she "got it from a bank." Melzer confronted defendant with the fact the previous Friday (November 11, 2016) was Veteran's Day and, therefore, banks would have been closed. (The parties stipulated banks were closed on Friday, November 11, 2016, in observation of Veteran's Day.) Defendant had no response and instead "looked at the floor." On cross-examination, Melzer agreed an ATM would have been operating on Veteran's Day even if the bank was closed.

¶ 19    Additionally, during their conversation, defendant's cell phone was sitting face up on the table between them, and defendant received the text message at issue. The contents of the message appeared on the screen. Melzer saw the message, believed it had evidentiary value, and took a photograph of the screen. The photograph was admitted into evidence without objection.

¶ 20    As the officers prepared to transport defendant and Greenhill to the jail, Melzer overheard a conversation between Greenhill and defendant. Greenhill asked defendant, "What did you say to [Moore]?" Defendant responded, "I didn't say shit." Greenhill replied, "Good. Then they ain't got shit on us."

¶ 21    Forensic scientist Denise Young examined the vacuum-sealed bag and the white grocery bag for latent fingerprints that she could then compare to fingerprint standards obtained from defendant and Greenhill. She found only one latent print suitable for comparison, which was on the grocery bag. She compared the latent print with the fingerprint standards and determined the latent print matched defendant's right thumbprint. She did not, and could not, determine when the

print was deposited on the bag. At trial, Young explained fingerprints are "fragile substances" that can be rubbed off by friction, but "can [also] be extremely durable and last a very long time."

¶ 22    Detective Bowers, who was qualified, over defendant's objection, as an expert witness in the field of "drug dealing, delivery, intent to deliver," testified he reviewed the case file for this case and ultimately opined defendant possessed the cocaine with intent to deliver it. Specifically, Bowers reviewed Melzer's field report, photographs of the cocaine that were taken by Melzer, and the laboratory reports establishing defendant's thumbprint was on the grocery bag and the weight of the cocaine. He also spoke to Trooper Melzer, examined the actual bag of cocaine, and viewed the photograph of the text message received by defendant.

¶ 23    Bowers explained the basis for his opinion as follows. He noted the total weight of the cocaine and the manner in which it was packaged was consistent with wholesale drug dealing. He explained cocaine sold for personal use is typically in powder, not brick, form and is packaged in small quantities, ranging from "a gram up to maybe half an ounce." Further, Bowers noted the street value of cocaine recovered by Melzer was between $19,000 and $24,000. He also explained a typical dose ranges from 0.2 to 0.5 grams and drug users typically have in their possession, in addition to their drug of choice, a means to ingest the drugs. However, no means to ingest the cocaine was found in the car. Bowers also testified he considered the contents of the text message at issue in reaching his opinion. Before Bowers published the content of the message, the court instructed the jury as follows:

> "He's going to read of the text, folks, and it's only to be allowed not for the truth of the matter asserted; in other words, what this gentleman actually says in the text as to whether it's true or not, but only as to form an opinion by the detective as to his overall opinion as

to the purpose of the use of the cocaine. So it will make a little more sense I think once you hear the text message."

¶ 24                               2. *Defendant's Evidence*

¶ 25    Defendant testified she lived in Minnesota and had known Greenhill since 2010, engaging in an off-and-on relationship with him between 2014 and 2016. Greenhill invited her to join him on a trip to the Chicago area so he could visit his sister, who was also defendant's good friend. Defendant agreed, so that she could visit defendant's sister and also "work on some of [her and defendant's] relationship issues."

¶ 26    Around 10 or 11 p.m. on Saturday, November 12, 2016, defendant and Greenhill left from St. Paul, Minnesota. Defendant expected to stay in the Chicago area "at least through Tuesday [November 15]." Defendant drove her to a hotel in Hillside, Illinois. When they arrived at the hotel, around 7 a.m. Sunday morning, defendant slept for several hours because she had been drinking and partying with Greenhill in the few days before they left Minnesota. She woke up later Sunday evening, and she and Greenhill went to Greenhill's sister's house, where they stayed for "[q]uite a few hours" before leaving to return to the hotel around 3 or 4 a.m. Monday morning (November 14).

¶ 27    Greenhill woke up defendant on Monday morning, unexpectedly telling her they "needed to come back to Minnesota." Defendant did not ask Greenhill why they were cutting their trip short and did not check the time. She began gathering her belongings so they could leave. Over the two-day period they were in the Chicago area, Greenhill left defendant two or three times without telling her where he went.

¶ 28    When asked about the grocery bag on which her thumbprint was found, defendant explained she and defendant stopped at a gas station on their way to Chicago. She purchased a

bottle of water, a Gatorade, an energy drink, and a pack of cigarettes, which were placed in the bag. She took the bag to the Maxima and placed it in the back seat, reaching back and taking items from it as needed. And when asked about the text message, defendant testified she knew several people named Daniel, she was not expecting to receive the text message, and, to her knowledge, the text message had nothing to do with cocaine.

¶ 29     Defendant further testified she did not know the cocaine was in the Maxima and did not see the cocaine until the officers showed it to her in the interrogation room. In her written statement, she told officers she had no idea the cocaine was in the vehicle.

¶ 30     On cross-examination, defendant acknowledged she told Melzer at the scene that she had visited her friend on Friday, November 11, 2016. She also acknowledged she had previously testified that she and defendant left Minnesota "very, very, very late Friday night [November 11], early Saturday morning [November 12]" and that she arrived in Hillside on Saturday morning. According to defendant, Greenhill told her he owned the Maxima when he picked her up in Minnesota. When asked whether she told Melzer a friend had lent them the Maxima, defendant testified she could not recall if she did, but she recalled Greenhill telling Melzer the Maxima belonged to a friend. In her written statement, defendant stated, "I am unaware of who actually owns the vehicle but it was in his possession when we met Friday."

¶ 31                              3. *Verdict*

¶ 32     At the close of evidence, the court instructed the jury that any evidence that had been received for a limited purpose should not be considered for any other purpose. The jury found defendant guilty of both offenses.

¶ 33                    E. Defendant's Motion for New Trial

¶ 34    Defendant moved for a new trial and, separately, in arrest of judgment. Neither motion contended the court erred by permitting Bowers to testify to the content of the text message. The court denied the motions.

¶ 35                                    F. Sentencing

¶ 36    Prior to sentencing, the court ordered a presentence investigation report (PSI) be prepared for defendant. The PSI showed defendant had one prior conviction, a 2010 Minnesota conviction for "possession or sale of [a] small amount of marijuana," which was a petty misdemeanor. Defendant did not recall details regarding the charge and believed she may have been given a ticket and not arrested.  The PSI also showed defendant occasionally used alcohol and marijuana but had not used either since her arrest in this case. Regular drug testing, which was a condition of her pretrial release, confirmed this.

¶ 37    The PSI also indicated defendant was the single mother of a 13-year-old son, who had lived with her until she was taken into custody and now lived with her father. Defendant struggled academically in high school and, in 2002, dropped out before graduating. While in school, defendant was suspended "a handful" of times for "smarting off" to teachers and arguing with other students. In 2004 and 2005, she worked at a mortgage company and left when she became pregnant. She returned to work in 2007, working as a restaurant server until 2013 when the restaurant closed. In 2012, she began working as an administrative assistant. She stopped working as a result of a 2018 car accident, which caused her back pain, "nerve issues," and muscle spasms. Defendant had "very supportive" parents who "always" helped her financially.

¶ 38    At sentencing, defendant submitted five letters that were written by her friends, son, father, and former boss. The letters stated defendant was a devoted and loving mother and daughter and described her as loyal, selfless, and hardworking. The letters expressed disbelief that defendant

had committed any offense because she was a law-abiding person who would not have jeopardized her son's life and stated she was simply in the wrong place at the wrong time. Defendant stated in allocution that the jury had made a mistake in convicting her, she never would have knowingly ridden in a car that was transporting drugs, and her 13-year-old son "mean[t] the world to [her]."

¶ 39   The State noted the applicable sentencing range on the possession-with-intent-to-deliver count was 9 to 40 years and recommended the court sentence defendant to 22 years' imprisonment. In aggravation, the State emphasized defendant's failure to take responsibility and that she had been uncooperative, untruthful, and evasive from the date of her arrest through the preparation of the PSI. Defendant argued the PSI showed she had been a law-abiding citizen her entire life as demonstrated by her short criminal history. She noted she had experienced "hard times" and difficulty in school, but nevertheless devoted her life to her son. Further, she noted her son would be nearly 30 years old if she was sentenced as the State had recommended. Accordingly, she asked the court to impose a sentence "close to the minimum," so defendant could "look forward to a day not in the unforeseeable distant future but a day closer at hand where she can be restored to her child, her family, [and] her lifestyle."

¶ 40   The court sentenced defendant to 16 years' imprisonment. In doing so, the court noted it had considered "all the factors in aggravation and mitigation," and it did not consider as aggravating defendant's persistent denial of guilt or any lack of participation in the PSI. The court stated it looked to "the nature of the offense, in particular the range" and noted, "[t]his was the 100- to 400-range. Where in the range does that—do those drugs fall. And she's not at 100 or 101 or 102. Just shy of 200, twice the minimum amount there."

¶ 41   Defendant did not move to reconsider sentence. Instead, at the conclusion of the sentencing hearing, after the court admonished defendant of her appeal rights (see Ill. S. Ct. R. 605(a) (eff.

Oct. 1, 2001)), defense counsel stated, "we are going to be seeking appointment of appellate counsel. My client is bereft of funds." This appeal followed.

¶ 42                                    II. ANALYSIS

¶ 43                    A. Hearsay as Basis for Expert Opinion

¶ 44    Defendant first contends the trial court erred when it permitted the State to elicit the contents of the text message from Detective Bowers under the guise that they were a partial basis for his opinion that defendant possessed the cocaine with intent to deliver. Specifically, she argues the text message was hearsay, and, though experts may ordinarily rely on hearsay as a basis for their opinions, the State failed to lay the required foundation under Illinois Rule of Evidence 703 (Ill. R. Evid. 703 (eff. Jan. 1, 2011)), *i.e.*, that a text message such as the one at issue was something upon which other experts in Bowers' field reasonably rely in forming their opinions. Defendant maintains that, though she forfeited review of the issue by failing to raise it in her posttrial motion, she is entitled to relief under the plain-error doctrine.

¶ 45    To preserve an evidentiary ruling for review, "a defendant must raise it in *either* a motion *in limine* or an objection at trial, *and* in a posttrial motion." (Emphases in original.) *People v. Denson*, 2014 IL 116231, ¶ 18. Otherwise, the party forfeits review and must seek relief under the plain-error doctrine. The plain-error doctrine is a narrow exception to the forfeiture rule, which permits the reviewing court to grant relief if a clear and obvious error occurred and either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 46    The plain-error doctrine is inapplicable when the defendant invites or affirmatively acquiesces to an error. *People v. Stewart*, 2018 IL App (3d) 160205, ¶ 19. "The rule of invited error or acquiescence is a procedural default sometimes described as estoppel." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). Under this rule, a party cannot complain of error to which it consented, as it would be manifestly unfair to allow a party a second trial based on error which that party injected into the proceedings. *Id.* The rationale behind the rule is to prevent a defendant from inducing the trial court to proceed in a particular manner at trial and then later using that as a basis to secure reversal on appeal. *Id.*

¶ 47    We conclude defendant did not merely forfeit review of the purported error. Rather, she affirmatively acquiesced to it. The issue here was raised at the hearing on the State's motion *in limine* to allow Bowers to testify as an expert. At the hearing, the State told the court it intended to introduce the contents of the text message through Detective Bowers on the basis that he considered the text message in forming his opinion. Admittedly, defendant challenged the issue at the hearing, arguing the text message should be excluded because it was vague, "blatant hearsay," there was no "technical information from the source," and the declarant would not be subject to cross-examination. However, during trial, defendant backtracked on her position, ultimately *agreeing* the contents of the text message could come in as a basis for Bowers' opinion subject to a limiting instruction that was ultimately given. And, when the court noted Bowers could consider the text message because drug dealers would typically receive requests to purchase and that "Rule 704" permitted experts to rely on hearsay as a basis for their opinions, defendant responded, "I'm not challenging it on that basis."[1] In other words, defendant told the court she was not challenging

---

[1] We have placed Rule 704 in quotes here because, based on context, it appears the trial

the text message on the basis she now presents on appeal. Rather, she made clear she had no objection to its admission as long as the court read a limiting instruction before Bowers published the contents. Simply put, defendant acquiesced to the ruling she complains of on appeal, and she cannot use that as a basis to secure reversal. *Swope*, 213 Ill. 2d at 217.

¶ 48    And even if we were to analyze case under the plain-error doctrine, defendant has not established she is entitled to relief. On this point, we first note our common experience establishes a detective who investigates drug crimes, such as Bowers, would reasonably rely on a statement to a person found with a large quantity of drugs that references a "buy," especially given its timing and the other evidence Bowers had at his disposal in rendering his opinion. Admittedly, the court did not formally make this finding, but it did reference the notion during the discussion at defendant's trial, noting Bowers was using the text message under the notion "that this is something that typically a drug dealer would have, [i.e.] requests to purchase coming in on their phones."

¶ 49    In any event, even excluding the evidence relating to the text message, the evidence, viewed in its totality in the context of this trial (see *People v. Belknap*, 2014 IL 117094, ¶ 50), overwhelmingly established defendant possessed with intent to deliver the cocaine. The State's evidence established defendant was seated next to a vacuum-sealed, 195.1-gram brick of cocaine that had been bundled in a plastic grocery bag and secreted beneath the center console of a vehicle which was being driven from Chicago to Minnesota. While defendant's mere proximity next to the cocaine may not have been enough, on its own, to establish she possessed it (*People v. Schmalz*, 194 Ill. 2d 75, 81 (2000)), the presence of defendant's right thumbprint on the grocery bag in which

---

court meant to reference Rule 703.

it was secreted was strong evidence of her intent and capability to maintain control and dominion over the cocaine. *People v. Pittman*, 2014 IL App (1st) 123499, ¶ 36. Further, defendant's inability to keep her story straight, failure or inability to provide key details of the trip, and her conversation with Greenhill immediately before they were transported to the jail demonstrated consciousness of guilt and certainly rendered her a less than credible witness. See *People v. Hommerson*, 399 Ill. App. 3d 405, 410 (2010) (false exculpatory statements are evidence of consciousness of guilt); *People v. Sebby*, 2017 IL 119445, ¶ 53 (reviewing court may consider evidence regarding witness's credibility in determining whether evidence was closely balanced). And given defendant's undermined credibility, her self-serving, benign explanations at trial of her inconsistent statements and the presence of her thumbprint do not tip the scales back toward her favor.

¶ 50   Moreover, the large quantity of cocaine recovered—according to Bowers's testimony, enough for at least 390 individual doses and having an ultimate street-level value of at least $19,000—cannot "reasonably be viewed as designed for personal consumption." *People v. Robinson*, 167 Ill. 2d 397, 410-11 (1995). The large quantity of cocaine, coupled with the large quantity of cash recovered from defendant's purse, the presence of one more cell phone than occupants of the car, and the method in which the cocaine was packaged was conclusive of defendant's intent to deliver. See *People v. Starks*, 2019 IL App (2d) 160871, ¶ 37. Accordingly, even if we overlooked defendant's acquiescence, she cannot establish the evidence was closely balanced and, therefore, cannot establish she is entitled to relief.

¶ 51      B. Defense Counsel's Failure to Move to Reconsider Defendant's Sentence

¶ 52   Defendant next contends defense counsel was ineffective for failing to move to reconsider her sentence. She maintains that, though the trial court, in imposing sentence, "briefly mentioned"

it had considered "all the factors in aggravation and mitigation," it made no specific mention of certain mitigating facts. She argues the record shows counsel's decision to forgo a motion to reconsider was not based on strategy, but rather on defendant's lack of funds, and, even if it were a strategic decision, no reasonable attorney would have undertaken that strategy. Further, she argues that, had counsel filed the motion, there is a reasonable probability the trial court or this court would have reduced her sentence. She asks that we reduce her sentence to the minimum permissible term of imprisonment, in this case nine years (see 720 ILCS 570/401(a)(2)(B) (West 2016)), or, in the alternative, remand the matter to afford her the opportunity to file a motion to reconsider.

¶ 53    The sixth amendment guarantees a defendant the right to effective assistance of counsel at all critical stages of criminal proceedings. *People v. Hughes*, 2012 IL 112817, ¶ 44. Because a motion to reconsider sentence is a critical stage of criminal proceedings, a defendant is entitled to effective assistance of counsel at that stage. *People v. Bailey*, 364 Ill. App. 3d 404, 408 (2006). To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below an objectively reasonable standard and the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Caballero*, 126 Ill. 2d 248, 259-60 (1989). Because defendant must meet his burden on both the performance and prejudice prongs, courts may resolve ineffective assistance claims by deciding only the prejudice prong. See *People v. Cherry*, 2016 IL 118728, ¶ 24.

¶ 54    Generally, the filing of a motion to reconsider sentence is a strategic decision which is left to counsel's professional judgment. *Bailey*, 364 Ill. App. 3d at 408. And because the decision is left to counsel's judgment, we will not presume prejudice. *Id.* Indeed, the "general failure to file a

motion to reconsider sentence does not *per se* amount to ineffective assistance of counsel, as some basis must exist to make the motion." *Id.*

¶ 55    Here, the record shows counsel's decision to forgo a motion to reconsider sentence was not based on his strategy but, rather, motivated at least in part by defendant's lack of funds. Moreover, there is no indication counsel even consulted with defendant about his decision or its effect on her ability to challenge her sentence on appeal. See *People v. Owens*, 386 Ill. App. 3d 765, 771 (2008) (a defendant is entitled to consult with counsel to determine whether to file a motion to reconsider sentence). And, by failing to challenge her sentence in a motion to reconsider, defense counsel forfeited defendant's ability to challenge her sentence on appeal.

¶ 56    But even if we were to conclude counsel's failure to file the motion was objectively unreasonable under prevailing professional norms (see *Cherry*, 2016 IL 118728, ¶ 24), defendant has not established she was prejudiced by counsel's failure. Defendant claims she was prejudiced because, had the motion been filed, there is a reasonable probability the trial court or this court would have reduced her sentence. She argues the trial court overlooked certain mitigating facts in fashioning its sentence, specifically, her short criminal history, which consisted of a single misdemeanor conviction for a small amount of marijuana, the fact her offense had no direct victim, her supportive family, her stable employment until her 2018 car accident, and her compliance with the terms of her bond while awaiting trial. She maintains, in light of the mitigating factors, it is reasonably likely the trial court or this court would have reduced her sentence. We disagree.

¶ 57    First, all the facts defendant claims the trial court overlooked were placed in front of the court before it made its sentencing determination. Indeed, the PSI and letters submitted on behalf of defendant, which were tendered to the court and which we presume the court reviewed and took into account (*People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19), set forth much of the mitigating

information defendant claims the court overlooked, including her lack of prior felony convictions, her stable employment, her devotion to her son, and her supportive family. Further, the sentencing judge, who presided over defendant's trial, was aware of the fact the offense did not have a direct victim or cause or threaten direct harm to another and knew defendant had complied with the conditions of her pretrial release. Further, at the sentencing hearing, defense counsel emphasized defendant's lack of criminal history, the fact she had been a law-abiding citizen her entire life (save for her one misdemeanor conviction), and her devotion to her family. Because all of the mitigating information on which defendant relies was placed before the court and the court expressly noted it considered "all" of the mitigating and aggravating factors, we are unable to conclude the court would have reduced defendant's sentence had the motion been filed.

¶ 58    Second, we are not persuaded by defendant's argument that there is a reasonable probability this court would have granted defendant relief had counsel preserved a sentencing challenge by filing the motion. The trial court has broad discretionary powers in imposing a sentence, which are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). In imposing sentence, the trial court must carefully consider all aggravating and mitigating factors, including "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The trial court, not the reviewing court, is in the best position to assess the aggravating and mitigating factors. *Alexander*, 239 Ill. 2d at 213. Accordingly, a court of review will not reweigh the aggravating and mitigating factors or substitute our judgment for that of the trial court merely because we would have weighed the factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).

¶ 59    We note the offense on which defendant was sentenced was a Class X offense subject to an enhanced punishment range of 9 to 40 years' imprisonment. 720 ILCS 570/401(a)(2)(B) (West 2106). Here, defendant's 16-year sentence fell within the applicable sentencing range, and, therefore, it is presumed the trial court did not abuse its discretion in imposing the sentence. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 60    Further, it is well settled the seriousness of the offense is the most important sentencing factor. *People v. Murray*, 2020 IL App (3d) 180759, ¶ 30. A court need not impose the minimum sentence in the presence of mitigating factors, even in the absence of aggravating factors. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55.

¶ 61    Here, the record shows the trial court considered the aggravating and mitigating factors present in the record and placed more weight on the seriousness of the offense, which it was entitled to do in the exercise of its discretion. We acknowledge defendant was a devoted mother who had been stably employed, with minor and explained interruptions, for most of her adult life, which we find commendable and which are certainly mitigating factors. See *People v. Palmer*, 188 Ill. App. 3d 414, 431 (1989). We also acknowledge defendant's short criminal history is a mitigating factor. See *id.* However, given the seriousness of the offense—indeed, the 195.1 grams of cocaine defendant was found to have possessed was being transported over two state lines and had an ultimate street-level value of at least $19,000—we are unable to conclude defendant's sentence was "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Charleston*, 2018 IL App (1st) 161323, ¶ 16. Accordingly, we conclude defendant has not established she was prejudiced by counsel's failure to move to reconsider her sentence, and, therefore, her ineffective-assistance claim fails.

¶ 62                                 III. CONCLUSION

¶ 63    For the reasons stated, we affirm the judgment of the circuit court of Boone County.

¶ 64    Affirmed.